No. 10.—John McPherson, plaintiff in error, *vs.* The State, defendant in error.

[1.] Dying declarations of *belief*, are not admissible as evidence.

[2.] The jury being the judges of the law, and the fact, are not bound to go by the charge which the Court makes, as to what is the law, unless the charge truly states what the law is; and whether the charge does that or not, the jury have the *right* to decide.

[3.] Although a witness may be impeached, and may not afterwards be corrobo-rated, yet, it must be a question for the jury, whether he is not still to be be-lieved, notwithstanding tne impeachment.

[4.] A threat made by a man when under excitement, is not of as much weight, as one made by him when not under excitement; but the difference in the weight of the two threats, is a question for the jury, not for the Court

[5.] If a threat is *equally* susceptible of two constructions, the one in favor of the hypothesis of innocence, is the one that ought to be adopted.

[6.] If a man, though intending to commit an unlawful act, abandons his intent to do so, and afterwards by accident kills a man, the killing is not murder; nor is it involuntary manslaughter in the commission of an *unlawful* act.

[7.] Notice to A. cannot, in general, operate against B., so as to make B. *a crim-inal*, unless the notice has come to B's knowledge.

[8.] The owner has the right to shoot a person who is a burglar, or a person whom, on sufficient grounds, he believes to be a burglar; and the person seizing the owner's gun to prevent being shot, does not deprive the owner of this right, unless the person surrenders himself.

Murder, in Appling Superior Court. Tried before Judge COCHRAN, at May Term, 1857.

John McPherson was indicted for the murder of James Carter. The killing took place in the county of Appling, on the night of the 22d January, 1857.

The prisoner pleaded not guilty. After the testimony was closed, and the charge of the Court given, the jury retired and returned a verdict of involuntary manslaughter in the commission of an unlawful act.

The prisoner moved for a new trial; which motion the Court refused, and his counsel thereupon excepts, and tenders his bill of exceptions.

The substance of the evidence, and all the grounds of ex-ception, are so fully stated and set out in the decision of the Court, that it is unnecessary to re-state them here.

· The facts of the case, and the legal questions made and adjudicated, will fully appear from the following opinion.

GAULDEN, for plaintiff in error.

SOLICITOR GENERAL & T. T. LONG, for the State.

McPherson vs. The State.

*By the Court.*—BENNING, J. delivering the opinion.

The substance of the testimony in this case, it being a murder case, seems to have been as follows :

On the 22d of January, 1857, a number of persons were at McPherson's (who was the party indicted,) to assist him in moving a house. Among them were Carter, Spence, and Leggett; Carter being the man killed. At some time in the day, two gallons of liquor were procured, a part or the whole of which, was drunk up by the company. The drinkers became much excited, if not intoxicated, by the liquor, and, in consequence, behaved themselves in a noisy, rude, and disorderly manner. The job of moving the house was finished sometime before night. The company had dinner, and the dinner was at a late hour. The company did not leave after dinner. McPherson went to bed. The company still stayed. They "danced 'about;" they sang; some of them overturned a bench to the 'hazard of a child; two of them, Spence and Leggett, an hour and a half or two hours in the night, went into the smoke-house to get something to eat, first having told Mrs. McPherson that they intended to do so, to which she made no reply. Whilst in the smoke house, they made a noise—a board fell. The noise attracted the attention of McPherson; he got out of bed, remarking, that "he would kill some of them;" took down his gun, and went into the yard. Spence and Leggett hearing his threat, and hearing him take down his gun, ran out of the smoke house, Spence ahead. McPherson was then in the yard. Spence ran by him, and as he did so, McPherson snapped his gun at him.

It does not appear that Mrs. McPherson communicated to Mr. McPherson what Spence and Leggett had told her. The night was dark, clear and cold. Carter was standing in the dark when shot.

What happened then, was, *according to the testimony of the State,* this: Leggett, who was running close behind

Spence, when the gun snapped, caught the gun about mid-way of the barrel and asked McPherson "what in the world he meant?" To which McPherson replied, "what in the hell were you in the smoke house for?" McPherson ran back, holding the gun, and "kept jerking" it, until he got one step on the door. He "kept jerking" it, and then it went off and killed Carter, who was standing off in the yard.

Leggett, (one of the State's witnesses,) swore that he caught the gun to keep McPherson from shooting him; and that McPherson tried to take the gun away from him; that he was not "jerking" the gun, but that McPherson was; that he was holding on to the gun, to keep McPherson from shooting him; that when he caught hold of the gun, McPherson was five or six feet from the door.

But, *according to the testimony of the accused*, what happened then was this; McPherson said, "if you dont keep out of my smoke-house, I'll show you." Leggett said, "I'll break your damned head with the gun." When Leggett took hold of the gun, McPherson was going into the house, one of his feet being on the door block, and the other on the plank. Leggett was trying to get the gun away, and gave it a "jerk." McPherson fell up against the house, and the gun went off."

Several witnesses for the State swore, that they would not believe the witnesses for the accused.

A new witness or two for the accused swore, that they would believe the witnesses for the accused.

The counsel for the accused requested the Court to charge:

1st. That "the jury are the judges of the law and the facts, and are not bound by any charge that the Judge may give."

"2d. That McPherson must have intended to kill some one at the time the gun fired. There must be a co-operation of act and intention to constitute a crime."

"3d. If they believe it to be accidental and not intended by prisoner, the prisoner should be acquitted."

"That the witnesses who were attempted to be discredited,

are still competent, and the jury may or may not believe them."

4th. "That unless the jury are satisfied beyond all reasonable doubts that the firing of the gun which resulted in Carter's death, was the voluntary and individual act of defendant, done with the intention of killing Carter, or some other person, then they ought to find the defendant not guilty."

"5th. That if the jury believe from the evidence, that if the firing off of the gun was occasioned by the struggle between the defendant and Robert Leggett for the gun, they ought to find the defendant not guilty."

"6th. That if the jury believe from the evidence, that the firing of the gun when Carter was killed, was not intended by defendant, but that the gun went off by accident, then they should find the defendant not guilty."

"7th. That if the jury believe that the killing of the deceased was the result of misfortune or accident, unaccompanied with any evil design or intention on the part of the defendant to kill any one when the gun went off, then the jury should find the defendant not guilty."

"8th. That if the jury should believe that the firing of the gun was the voluntary act of the defendant, still if it was fired off without any actual intention on the part of the defendant to kill Carter, or any one else, then the jury ought to find the defendant not guilty."

"9th. That a threat made under excitement, no matter from what cause this excitement emanated, will not authorize the jury to presume that an act done after that threat was made, was deliberately done, and that a threat which accused would not have made in his cooler moments, or made under excitement of any kind, is entitled to but very little weight."

"10th. That where a threat is proven to have been made which is susceptible of two constructions, the one an innocent, the other a criminal construction, that it is their duty to give the threat that construction most favorable to the prisoner."

Of these requests the Court refused the 1st, the first part of the 3d, the 4th the 5th, the 6th, the 8th, the 9th, and the 10th: granted the 2d; granted the last part of the 3d, but with the addition," that they are competent" (the witnesses impeached) "and may be believed if corroborated;" and granted the 7th, but granted it with "comments." What the comments were does not appear.

The Court then gave the following charge to the jury:

"That if the prisoner went out of his house with a riotous intent of killing Spence, or any one else, and was foiled in this, and any one else was killed by him, though he did not intend it, that he was guilty; that if Spence and Leggett went into the smoke-house with notice to Mrs. McPherson, the prisoner's wife, prisoner had no right to use a deadly weapon on them, it being at most, a trespass.

"That if Leggett took hold of the gun to protect himself, he had a right to do so, and if the consequences were fatal to Carter, prisoner was guilty. And that if the prisoner did not intend to kill Carter, but went into the yard with evil design towards Spence and intended to kill him, still he was guilty.

"If you believe from the testimony that prisoner was in the pursuit of a lawful act, and did not use due caution and circumspection he is guilty of involuntary manslaughter."

The jury found the accused guilty of involuntary manslaughter in the commission of an unlawful act.

The accused then moved for a new trial, and on the following alleged grounds:

1st. That the verdict was contrary to the evidence.

2d. That the verdict was contrary to the law.

3d. That the verdict was contrary to the charge of the Court.

4th. That the Court erred in its charges and its refusals to charge.

5th. That the Court erred in ruling out the dying declarations of the deceased, which went to show that he said that he, deceased, did not believe that prisoner did intend to hurt him.

6th. That the whole charge to the jury was wrong.

7th. That from the tenor of the Judge's charges an intimation was given of what the Judge thought was proved.

The Court overruled the motion for a new trial.

The accused excepted to the judgment overruling the motion for a new trial; and he assigns, as errors, that judgment, the charges given, the charges refused, and the rejection of the dying declarations of Carter, the person killed.

Was the Court right in rejecting the testimony offered as to the dying declarations of Carter.

[1.] We think so. The "*belief*" of Carter could not be entitled to more respect than that to which the belief of a witness is entitled.

As to the *requests:* Is it true, that "the jury are the judges of the law, and the facts, and are not bound by any charge that the Judge may give?"

The 16th section of the 14th division of the Penal Code, is as follows: "On every trial of a crime or offence contained in this code, or for any crime or offence, the jury shall be judges of the law, and the fact, and shall in every case give a general verdict of "guilty," or "not guilty," and on the acquittal of any defendant or prisoner, no new trial shall on any account be granted by the Court."

"*Judges of the law and the fact;*"—Can the word *judges*, have one meaning, when taken in connection with the words, "*of the law*," and another, and a greater meaning, when taken in connection with the words, "*and the fact?*" I am not able to see how it can. That it must have the same meaning, when taken in connection with the one set of words, that it must have when taken in connection with the other, seems to me most manifest.

But the meaning which the word has, when taken in connection with the words, "*and the fact*," is, at least, that the jury shall have the *right* to decide for themselves what the facts are.

Does it not follow, then, that the meaning which the word has, when taken in connection with the words, "*of the law*," must be, that the jury shall have the *right* to decide for themselves what the law is. I think so. See *Ricks vs. The State*, 16. *Ga. Rep.* 603. *Holder vs. The State*, 5. *Ga. Rep.* 441.

Suppose, however, the Court give a charge, which truly states the law, are not the jury bound to go by the charge? Certainly they are; but the reason why they are, is not that the charge is the act of the Court, but that the charge truly states the law. In such a case, it is, perhaps, hardly proper language to say, that it is the *charge* by which the jury are bound. What they are bound by, is the *law ;* but that happens to be contained in the charge.

Practically, however, the difference between being bound by a charge which truly states the law, and being bound by the law which the charge truly states is not material.

[2.] Hence we do not say that the Court was wrong in refusing the request; it being a request, in one of its parts, that the Court would tell the jury, that they were not bound by *any* charge that the Court might give. If the request had been, that the Court would tell the jury, that they were not bound by any charge of the Court, unless the charge truly stated the law; and that whether the charge truly stated the law or not, they had the right to decide for themselves: we think the request would have been one that ought not to have been refused.

There is a check upon this extensive power of the jury: the Court can veto the verdict, and grant a new trial. I do not know of any other.

The first part of the third request, leaves out of view all the law relating to involuntary manslaughter. But that is

the law most applicable of all to the case.    The Court, there-
fore, was right in refusing this part of the request.

The latter part of this request was, for the Court to say,
that the witnesses whom there was an attempt to impeach,
were " still competent."    This part the Court gave, but, with
the addition, that the witnesses might be believed, if corrobo-
rated.    In this addition, is contained an implication, that the
witnesses, if not corroborated, were not to be believed.

But suppose impeaching witnesses themselves to be enti-
tled to no credit, what then does their testimony amount to ?
Nothing : And therefore, in such case their testimony does
not weaken the testimony of the impeached witness; but if
their testimony does not weaken his, it does nothing requir-
ing his to be corroborated.

[3.] Although, therefore, a witness may be impeached by
other witnesses, and may not be afterwards corroborated, yet,
it must be a question for the jury, whether the impeachment
has been successful, and therefore, whether the witness is not
to be believed, notwithstanding the impeachment.

If this be true, as we think it is, it follows that the Court
erred in adding what it did to this second part of the request.

As to *the fourth, the fifth, the sixth,* and *the eight* requests ;
the same may be said of them, that was said of the first
part of the third.

As to the seventh—not being able to know what the "com-
ments" were, we cannot tell whether there was any error in
them or not.                                                    :

[4.] If the *ninth* request had been, that the Court would
tell the jury that a threat made by a man when excited, is
not to have *as much* weight, as a threat made by the man
when cool, the request would, doubtless, have been a proper
one.

But the question, as to *how much less* is to be the weight,
which the threat made under excitement, is to have, is a ques-
tion for the jury.

The ninth request sought to make this a question for the Court.

Therefore, the Court could not be wrong in refusing that request.

[5.] If the expression in the tenth request, had been, *equally* "susceptible," the request would have been a request proper to be granted. The absence of the word, *equally*, rendered the request one not proper to be granted. This must be manifest. If there is a reasonable *doubt*, the hypothesis of innocence, ought to have the benefit of the doubt.

As to the *charges*. The first of these was this: "That if prisoner went out of his house with a riotous intent of killing Spence, or any one else, and was foiled in this, and any one else was killed by him, though he did not intend it, that he was guilty."

[6.] Suppose, after being foiled in the riotous intent, he *abandoned* that intent, and thenceforth, was free from all evil intent, and yet, by accident killed the man, was he guilty? In such case, it could not be that at the time of the killing, he was engaged in the commission of an *unlawful* act. A man *committing* an act, must be acting voluntarily, and a man voluntarily doing an unlawful act, cannot be said to be free from all evil intent. If then, McPherson, when his gun went off and killed Carter, had abandoned, or was free from all evil intent, it could not be, that at that time, he was engaged in the commission of any *unlawful* act. But unless, at the time of the killing, he was engaged in the commission of some unlawful act, he could not be guilty of murder, or of one species of manslaughter, the one of which the jury found him guilty—involuntary manslaughter in the commission of an unlawful act.

The latter part of the charge, then, should have been qualified: "Whilst *in the prosecution* of that intent," should have been inserted—"And any one else was killed by him,"—*whilst in the prosecution of that intent*—"though he did not

intend it, that he was guilty." This is what the latter part of the charge should have been.

But does the evidence warrant this charge at all? Can it be fairly argued from the evidence, that McPherson went out of his house with a *riotous* intent? To make a riot, there must be the *joint* action of two, or more, persons. The *co*-operation of two, or more persons. If two, or more, men beat a third, the offence *may* amount to a riot. But if *two* men fall to fighting *each other*, the offence *cannot* amount to a riot. 1. *Hawk. C.* 65, *S.* 1. *Com. Dig.* "Forcible Entry," (*D.* 8.)

Now are we authorized by the evidence to say, that McPherson, when he went out of the house, did so with the intention or expectation of *co*-operating with any body in any act of any sort? Was it not peculiarly action "on his own hook," that he sallied forth in pursuit of?

The next charge is: "That if Spence and Leggett went into the smoke house, with notice to Mrs. McPherson the prisoner's wife, prisoner had no right to use a deadly weapon on them; it being at most a trespass?

[7.] Notice to McPherson's wife, was not a fact upon which McPherson could act, unless he knew of the notice. A man cannot in general, be held accountable as *a criminal* for failing to govern himself by something of the existence of which he is ignorant. There does not seem to be any thing in the evidence to take the case of McPherson out of the general rule.

Again, suppose the truth to be, that though Spence and Leggett notified Mrs. McPherson of their purpose, yet that she *failed to consent* that they might accomplish that purpose. In that case, there can be no doubt, that the notice would be, what would not only be of no avail to the State, but would be, what might be of much avail to the accused. If Spence and Leggett went into the smoke-house without her consent, it might be, that they were burglars or house thieves. And it is justifiable homicide to kill, in defending habitation, pro-

perty, or person, "against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either." 12. *Sec.* 4. *Div. Code.*

We think, therefore, that the Court should rather have told the jury, that the notice to McPherson's wife, was not a fact that could operate against McPherson, unless he knew of the notice.

The next charge was as follows: " That if Leggett took hold of the gun to protect himself, he had a right to do so, and if the consequences were fatal to Carter, prisoner was guilty."

[8.] Suppose that Leggett was a *burglar*, and being such, took hold of the gun to prevent himself from being shot, and that in the struggle for the gun, it went off and killed Carter ; would McPherson in that case, be guilty of murder, or man-slaughter in the commission of an *unlawful* act ? Is it not *lawful* for the owner to kill a burglar? Most certainly it is. See 12. *Sec.* 4. *Div. Code. supra.* Does the owner lose this right by the burglar's seizing the owner's weapons to prevent him from exercising the right ? Not, it would seem, unless the burglar surrenders himself. There may be doubt on this point. But this is the best conclusion we can come to, at present, on the point. It was not discussed.

It is true, perhaps, that the evidence hardly justifies the supposition, that Leggett was a burglar; but then it is not perhaps equally true, that the evidence does not authorize the supposition, that McPherson might have believed Legget to be a burglar. And if McPherson did believe Leggett to be a burglar and the circumstances were such, that they would have justified a reasonable man in entertaining such a belief, then the case, doubtless, was not materially different from what it would have been, of Leggett had really been a burglar.

We think then, that this charge should have been somewhat qualified ; so qualified as to become this : that if Leggett was

not a burglar or house thief, nor believed, on sufficient grounds to be one, by McPherson, then if he Leggett seized the gun merely to protect himself, he did but what he had the right to do; and if the consequences were fatal to Carter, McPherson was guilty.

This charge was amiss too, by being *deficient*. A part of the evidence went to show, that Leggett's object in seizing the gun was not defence but offence, was, to get possession of the gun, and break McPherson's head with it. And the charge to have been full, ought to have stated the law applicable to this part of the evidence. Doubtless, the Court will supply the deficiency on the new trial.

The next charge was as follows: "And that if the prisoner did not intend to kill Carter, but went into the yard with evil design towards Spence, and intended to kill him, still he was guilty."

This charge labors under much the same objection, as that which the first charge was found to labor under.

Suppose the fact to have been, that McPherson had *abandoned* his intention to kill Spence, (if such an intention had ever been his,) before the killing of Carter happened: In that case, it is manifest that the previous existence of such intention, could not be a fact to affect at all the question of his guilt or innocence.

In such case McPherson in struggling to retain his gun, would be in the commission of a *lawful* act, and whether the accidental homicide would be *justifiable* homicide, or involuntary manslaughter, in the commission of a *lawful* act, would depend on, whether in the struggle for the gun, he used due caution and circumspection. The homicide could not be of any higher grade.

This charge, then, ought to have been qualified in the manner indicated with respect to the first charge.

The next charge was right. Nothing was said against it in this Court.

As to the motion for a new trial:

In disposing of the exceptions already disposed of, we have disposed of all the grounds of this motion, except the seventh.

That ground, we do not think true in point of fact.

A new trial must be had; the grounds have been pointed out in the course of this opinion.

Judgment reversed