## COMMONWEALTH *vs.* DAVID R. BROWN.

An indictment on *St.* 1845, *c.* 27, which charges one of the defendants with using instruments, and the same defendant with other defendants with administering drugs, to procure a miscarriage, and that by both of said means the woman died, is not bad for duplicity, and proof of the use of either one of the means alleged is sufficient to warrant a conviction.

*It seems*, that an indictment, which avers that one defendant advised, ordered and commanded two other defendants to administer ergot to a woman pregnant with child, and provided the ergot for the purpose, knowing that it was dangerous to life, which ergot she according to his advice, order and command swallowed; and that he, " in so ordering, advising and commanding the said ergot administered to her," to be by her swallowed, it being for her provided by him as aforesaid, "so ordered, advised and commanded the same to be administered," with intent of him to cause her to miscarry, and in order that he might cause the destruction of the life of the child; and that she by means of said ergot, so ordered, advised and commanded to be administered to her, and so provided by him for her to swallow, and so swallowed, the same thereafter being administered to her by the other defendants with intent of them to cause her to miscarry, and in order that the three defendants might cause the destruction of the life of the child; and that she " by means of said ergot so administered and so provided by " him for her to swallow, and so swallowed, the same having been administered to her by the other defendants in pursuance of his aforesaid order, command and advice, by him given to them, died; charges him with administering the ergot as principal, and not as accessory.

An indictment on *St.* 1845, *c.* 27, which charges the procuring of a miscarriage by one or more of the means described in the statute, whereby the woman died, and whereby the defendant killed her, sufficiently avers that she died in consequence thereof; and does not charge the crime of manslaughter.

In an indictment on *St.* 1845, *c.* 27, which charges the use of instruments, the administering of drugs, and the thrusting of the hand into the womb after the coming forth of the child, with intent to procure a miscarriage, and the death of the woman in consequence of all the means so used, the averment as to thrusting in the hand may be rejected as surplusage.

*It seems*, that pregnancy ceases when the child has come forth from the womb of the mother, though the child is still attached by the umbilical cord, and though the afterbirth has not been removed.

On the trial of an indictment on *St.* 1845, *c.* 27, for using instruments to procure a miscarriage, thereby causing death, injured parts of the body of the deceased woman, preserved in spirits, may be exhibited to the jury in connection with the testimony of the physician who made the *post mortem* examination.

After proof of a common illegal purpose between the defendant and other parties, their acts and declarations in his absence, in pursuance of the common purpose, are admissible against him; and the question of the existence of such common purpose is primarily to be passed upon by the court, for the purpose of deciding on the admissibility of the evidence of such acts and declarations, but ultimately to be decided by the jury.

On the trial of an indictment on *St.* 1845, *c.* 27, against a physician for administering ergot, with intent to procure a miscarriage, whereby the woman died, evidence that the defendant was in the habit of receiving patients at his house for medical treatment, and that two young women, inmates of his family, were in the habit of attending them under the

defendant's direction, and of carrying them their meals, and that they both so attended the woman whose death was alleged in the indictment, and did her chamber work, and under the defendant's directions administered her medicines and gave her food; that they were present when the child was born, and told the defendant that they had got rid of her child, and that after her death the defendant directed them to say they gave her opium and camphor, not opium and calomel, and to say nothing about the ergot, and that he urged them to leave the house, which they did, is sufficient proof of a common purpose to render evidence of other acts and declarations of the same persons, not in the defendant's presence, tending to show that they gave ergot to her, admissible against him, with instructions that it is to affect the defendant only if the jury should be satisfied that the parties had a common purpose and design, and that the acts and declarations were done and made in pursuance thereof.

INDICTMENT against David R. Brown, Sarah E. Stokes and Lydia Emerson, on *St.* 1845, *c.* 27, which provides that " whoever maliciously or without lawful justification, with intent to cause or procure the miscarriage of a woman then pregnant with child, shall administer to her, prescribe for her, or advise or direct her to take or swallow, any poison, drug, medicine or noxious thing, or shall cause or procure her, with like intent, to take or swallow any poison, drug, medicine or noxious thing, and whoever maliciously and without lawful justification shall use any instrument or means whatever with the like intent, and every person with the like intent knowingly aiding and assisting such offender or offenders, shall be deemed guilty of felony, if the woman die in consequence thereof; " " and if the woman doth not die in consequence thereof, such offender shall be guilty of a misdemeanor."

The first count averred that Brown, a physician, on the 9th of August 1858, at Boston, upon Susan A. Webster, a woman pregnant with child, maliciously and without lawful justification used certain instruments, means and weapons to the jurors unknown, by therewith piercing, lacerating and cutting her womb, with intent to cause her to miscarry, and in order to cause the destruction of the life of the child, and thereby gave her mortal injuries, of which she languished until the 16th of August; that on the 10th of August, at Boston, Brown maliciously and without lawful justification advised, ordered and commanded Stokes and Emerson, spinsters, to administer ergot to said Webster, being then quick and pregnant with child, and provided the ergot for the purpose, knowing that it was danger-

ous to life, which ergot she, according to his advice, order and command, took and swallowed into her stomach; and that Brown, " in so ordering, advising and commanding the said ergot administered to the said Webster, to be by her taken and swallowed into her stomach, it being for her then and there provided by said Brown in manner and form aforesaid, so then and there ordered, advised and commanded the same to be administered, with the intent of him, the said Brown, by means of said ergot being taken and swallowed into the stomach of the said Webster, unlawfully, knowingly, maliciously and without lawful justification, to cause and procure " her to miscarry, " and in order that he the said Brown might unlawfully, knowingly, maliciously cause the destruction of the life of said child;" and " that said Webster, by means of said ergot, so ordered, advised and commanded to be administered to said Webster, and so provided by said Brown for said Webster to take and swallow into her stomach, and so then and there swallowed into her stomach, the same then and there thereafter being unlawfully, knowingly, feloniously, maliciously and without lawful justification administered to her by the said Stokes and Emerson, and with the intent of the said Stokes and Emerson by so administering said ergot to the said Webster " to cause her to miscarry, and in order that Brown, Stokes and Emerson might cause the destruction of the life of the child ; and that said Webster, " by means of said ergot so administered and so provided by said Brown for" her to take and swallow, and so swallowed into her stomach, the same having been administered to her by Stokes and Emerson, " in pursuance of the aforesaid order, command and advice of Brown, then and there by him unlawfully, feloniously, wilfully, knowingly, maliciously and without lawful justification given to said Stokes and Emerson," received mortal injuries, of which she languished until the 16th of August ; that Brown afterwards on said 10th of August, maliciously and without lawful justification, violently thrust his hand into her womb, she being then pregnant with child, and the child having been brought into the world, and being attached to her by the umbilical cord, with intent to procure her miscarriage, and in order

to cause the destruction of the life of the child, and thereby gave her mortal injuries, of which she languished until the 16th of August; that Stokes and Emerson, at the time of the use of the instruments, and of the thrusting in of the hand, were present, aided and assisted; and that Webster, by means of so being cut, pierced and lacerated with said instruments, weapons and means to the jurors unknown, and by means of having said ergot administered to her by Stokes and Emerson, and swallowing the same into her stomach, and by means of Brown's hand being so violently thrust into her womb, miscarried and brought forth a dead child on the 10th of August, and of all said injuries did die on the 16th of August; and that so Brown, Stokes and Emerson, "by the instruments, means and weapons aforesaid, the said ergot, and the hand of the said Brown, all used feloniously, wilfully and maliciously and without lawful justification, on the days and times and with the intents and purposes aforesaid, as aforesaid," on said 16th of August, at Boston, the said Webster, "feloniously, wilfully, unlawfully, knowingly, maliciously and without lawful justification, did kill, against the peace of said commonwealth, and contrary to the form of the statutes in such case made and provided."

A second count charged the three defendants with administering ergot to Susan A. Webster, a woman pregnant with child, with intent to procure her miscarriage, and without killing her. Brown was tried separately at March term 1859 of the municipal court of Boston, before *Nash*, J., and acquitted on the second count. So much of the bill of exceptions as is material to the questions of law applicable to the first count was as follows:

The defendant moved the court to quash the indictment for the following reasons: 1st. "The first count charges the defendant as principal in using instruments, and accessory in administering ergot." 2d. "The first count charges the defendant with three distinct offences, to wit, (1.) That he used instruments with intent to procure an abortion. (2.) That he administered ergot for same purpose. (3.) That, after the child was out of the womb, he put in his hand, and thus injured; which renders

the indictment double." 3d. " The indictment is double, as it charges the statutory offence and manslaughter." 4th. " There is no offence charged in either count; and the indictment is defective, double, and in law insufficient."

The court overruled the motion, " on the ground that the first part of said first count contains a sufficient technical charge of the statutory crime by the use of instruments, &c., and of death in consequence thereof; that the rest of the count may be considered matter of aggravation, and not as the statement of substantive crimes, so as to render the count bad for duplicity; that there is no sufficient technical averment that Brown was accessory before the fact to the administration of the ergot by Stokes and Emerson, because there is no sufficient allegation of the principal felony itself, by administering ergot, in said first count; that there is no allegation, in the latter part of said count, of manslaughter at common law, by thrusting in the hand, &c., after the child had come forth from the body of the mother, sufficiently full and technical to constitute the setting forth of a separate offence, and thus to render the count double.

The evidence for the Commonwealth tended to show that Brown received Webster into his house at her request, and used instruments upon her, for the purpose of procuring an abortion; and that ergot was administered to her for the same purpose, by Stokes and Emerson, by his direction; and that, after the child was out of her body, Brown, for the purpose of removing the afterbirth, inserted his hand into the womb, and peeled off the placenta from the interior of the uterus. Some of the evidence tended to show that there was a cut, as by a sharp instrument, near the mouth of and inside the uterus, and other injuries or lacerations near by, which had mortified, and that they were inflicted before delivery, and were an adequate cause, and the cause, of death; also that there were injuries at the top of the uterus, caused by the tearing away of the placenta after delivery, which had mortified, or turned into a gangrene, and were mortal, and an adequate cause of death. Other evidence tended to show that the injuries at the mouth of the uterus might not have been inflicted before delivery, and were not necessarily

mortal, nor an adequate cause of death.    Brown introduced evi-
dence tending to show that he was a regular physician, and as
such received Webster, for the purpose of curing her of the inju-
ries inflicted by a previous attempt of another person to procure
miscarriage; and that all that Brown did was done in the reg-
ular and due exercise of his profession.

It appeared that the defendant's family, at the time, consisted
of himself, his wife, Stokes and Emerson, both of whom were
about twenty years old, and two servants; that the defendant
was in the habit of receiving patients at his house for medical
treatment; and Stokes and Emerson were in the habit of attend-
ing upon them under the defendant's direction, and carrying up
meals to patients who were sick there.

Among other evidence to show that ergot was administered,
the government proposed to show " that, in the forenoon before
the delivery of the child, Stokes came into the kitchen with a
bottle containing a certain powder, and put some of it in a cup,
and poured hot water on it, and, while performing said act, said
to one of the servants, ' This is ergot,' and then went up stairs
towards the deceased's room, carrying the infusion ; and that at
other times during said day, and before the delivery, she per-
formed the same act, at the time remarking, ' More ergot,
Anna.' "

The court ruled " that the acts and declarations of others were
not admissible against the defendant, unless he and they at the
time were acting jointly in carrying out an unlawful design,
and were combined, and acting in combination, in the perpetra-
tion of some offence, and in pursuance of the original concerted
plan or design, and during the pendency of the criminal enter-
prise, and in its furtherance ; that whether the defendant and
Stokes and Emerson were so combined, and acting in concert,
was primarily a question of fact to be passed upon by the court,
preliminary to the introduction of the declaration accompanying
the act; but ultimately to be decided by the jury."    And the
court, " for the above purpose, and with the above limitations
and conditions, allowed the government, against the objections
of the defendant, to introduce evidence tending to show, that

from the time Webster came there, up to the delivery, Stokes and Emerson took care of her, and performed for her the chamber work usually done by the chambermaid; that they acted under the direction of the defendant in administering medicines and carrying up food; that they and the defendant, separately and together, were repeatedly in and out of the chamber of the deceased; that the defendant gave directions to them as to change of food for her; that the defendant said to them, ' Has she had her powders regularly ? ' that they two were present when the child was born, and Stokes announced it to the defendant when he came in, saying, ' Doctor, the child is born; but I have done nothing to her, because the afterbirth has not come; ' that the defendant knew and was informed of certain things done by said girls for the patient, and did not dissent or object; that, subsequently to said delivery, Stokes said to the defendant, ' I have got rid of her brat,' and described how, and Emerson at the same time remarked to the defendant, ' We're equal to the Hindoos in that respect; ' that, after the death, he conversed with them about the medicines, and told them that they must not say they gave her opium and calomel, but should say opium and camphor; and Emerson replied, ' I did not give her any powders; I gave her opium in drops, ergot, pickery and aloes ; ' to which the defendant's reply was, ' You must say nothing about the ergot ; ' and that the defendant urged the said girls to leave the house, after the death; and they left in pursuance thereof."

Whereupon the court decided, " as matter of fact, on the preliminary question, that there was *prima facie* evidence that the defendant and Stokes and Emerson were jointly acting in combination and concert, and aiding and assisting each other, in carrying out a common enterprise of procuring an abortion, so as to make the acts and declarations accompanying it, of Stokes and Emerson, done and made in the furtherance of, and during the pendency of, the unlawful enterprise, competent evidence to go to the jury, against the defendant, conditionally; " and admitted the evidence previously offered; and instructed the jury " that it was a question of fact for the jury to determine, whether the defendant and Emerson and Stokes were acting in

36*

concert, and coöperating with each in the common design of procuring the abortion ; that if so, the above acts of mixing said powder, and the declarations accompanying them, ' This is ergot,' ' More ergot, Anna,' if done and made during the transaction of, in pursuance of, and in carrying out the common design, and before it had been effected, were competent evidence to be weighed by the jury against the defendant ; but, if not so co operating, then they were not to be considered by the jury, but were to be rejected from the case, in pursuance of the general principle, that the acts and declaration of one person were not evidence against another."

The physician who made the *post mortem* examination was called as a witness at the trial, and was permitted by the court, notwithstanding the defendant's objection, to produce before the jury the uterus and vagina, preserved in spirits, and to point out to the jury the injuries thereto, and lacerations, cuts and gangrene thereon.

The court refused to instruct the jury, according to requests of the defendant, " that should the jury believe that an abortion was produced by the defendant by one of the means set forth in the indictment, and are unable to determine which, they cannot convict ; " or " that there can be no conviction on the first count, because it does not allege any crime, and because it is uncertain, and describes three distinct offences, two under the statute, and one at common law."

The court instructed the jury " that no acts of the defendant were covered by the statute, unless done while the woman was pregnant, and with an intent to procure a miscarriage, and before the child had come forth from the body of the mother ; that the miscarriage was completed when the child had come forth from the body of the mother, although still attached by the umbilical cord ; that it could not be predicated of acts done thereafter, for instance, in removing the placenta, that they were done on a pregnant woman, or with intent to procure a miscar riage, and consequently they were not the criminatory acts covered by the statute ; and that, in order to render the defendant guilty, the woman must have died in consequence of injuries

and lacerations inflicted by the defendant before the child came out of the womb; and that the death must have been the natural, ordinary and necessary consequence of said injuries, cuts and lacerations; and that the defendant was answerable for such injuries and lacerations, and the natural and unavoidable results thereof in the ordinary course of nature.

" That the first count in the indictment contained only a charge of the use of instruments, means and weapons; and that the other allegations therein, as to ergot, and thrusting in the hand, were merely details of matter in aggravation, incidentally connected with the main charge, and not as substantive charges of independent offences, and might be rejected as surplusage; and that, this having been done for the purpose of obviating the objection of duplicity, the case went to them under the evidence solely on the question of the use of instruments; that if the defendant, at the time and in the manner and form set forth in said first count, maliciously and without lawful justification, upon said Webster, then pregnant with child, used certain instruments (unknown), with the intent to cause and procure her to miscarry, and, in so doing, cut and lacerated her womb as therein set forth, and she died in consequence of and by means of said cuts, lacerations and injuries to her womb, then their verdict should be guilty.

" That if they found that the death was in consequence of the injuries inflicted in removing the placenta after the child had come forth from the body of the mother, a general verdict of guilty should not be rendered on said first count.

" That if the defendant inflicted said cuts and lacerations on the womb then containing the child, with the intent and in the manner alleged, and if the jury believed the medical testimony, that the child must come forth, or the woman die, and also the placenta must be removed, or the woman die, and thus through the neck and mouth of the womb so cut and lacerated, then it was proper for the jury to consider how said cuts and lacerations were naturally, ordinarily, and necessarily affected by such passage of the child and the placenta; and if the jury found the use of the instruments as above explained and set forth in

the count, and that the defendant thereby cut, lacerated and injured the womb as set forth and above explained, and that the said Webster died by means of, and in the natural, necessary and ordinary consequence of, and in the ordinary course of nature, by the unavoidable results of said cuts, injuries and lacerations, then their verdict should be guilty on said first count."

The defendant, being found guilty on the first count, alleged exceptions to all the above rulings, refusals and instructions, and also to the overruling of a motion in arrest of judgment for insufficiency of the indictment.

*N. Richardson & G. W. Searle*, for the defendant.

*S. H. Phillips*, (Attorney General,) for the Commonwealth.

This case was decided in June.

MERRICK, J.   This is an indictment under the "act to punish unlawful attempts to cause abortion." *St.* 1845, *c.* 27.   The defendant was found not guilty of the charge alleged against him in the second count.   By this acquittal his motion in arrest of judgment and his objections to the rulings of the court upon the questions of law, which arose at the trial in relation to that count, have become wholly unimportant, and therefore neither require nor admit of any further consideration.

During the trial the defendant submitted to the court a motion that the indictment might be quashed because it was insufficient in law ; the first count being, as he alleged, obnoxious to the objection that it was double, in various particulars : 1st. In charging him as principal in the commission of the alleged offence by the use of instruments, and also as an accessory thereto, by the administering of ergot.   2d. By charging him with three distinct offences, namely, in procuring abortion, (1.) By the use of instruments ; (2.) By the administering of ergot, and (3.) By violence applied by his hand.   And 3d. By charging him with the distinct crimes of manslaughter and of an attempt to procure an abortion.   The verdict of the jury being against him, he then moved in arrest of judgment for the same causes.   Both of these motions were overruled by the court ; to which determinations exceptions were seasonably taken.

Upon analyzing this count in the indictment, in which the charge against the defendant is set forth in great detail, and with much unnecessary circumlocution, it becomes apparent that there is no substantial foundation for any of these objections. He is not charged at all as an accessory, nor as having committed the crime of manslaughter, nor any other distinct offences. The averments that he provided ergot, and advised, ordered and commanded Stokes and Emerson to administer it to Susan A. Webster, then and there quick and pregnant with child, and by so ordering, commanding and advising, and by the taking and swallowing such ergot into her stomach by the said Webster, he did administer the same to her unlawfully and without lawful justification and with intent to cause and procure her to miscarry and be prematurely delivered of said child, constitute a full and distinct allegation that he committed the offence prohibited by the statute; and thus charge him directly as the principal felon, and not as the accessory of others in the perpetration of the offence set forth in the indictment.

Nor is he charged as having committed the crime of manslaughter. The statute provides that if the woman shall die in consequence of the doing of any of the acts prohibited, which are done to procure and cause her miscarriage, the punishment to be inflicted upon the offender shall, to a certain specified extent, be increased and aggravated. And the averment that the defendant, by the several means mentioned in the indictment, and with the intents and purposes therein set forth, namely, to cause her miscarriage and to procure the premature delivery of her child, did kill the said Webster, is only alleging in another form of words that she died in consequence of the use of the means and instruments, and the administering of the ergot provided, by the defendant. Taken in connection with other parts of the accusation, no sensible construction can be put upon the language used, which does not lead conclusively to this result.

All the averments in reference to the violence upon the person of Webster by the hand of the defendant were evidently

introduced into the indictment upon the assumption that the severance of the umbilical cord, after the child had come forth from the body of the mother, was essential to constitute and complete the miscarriage. If this assumption was correct, then the means employed to make that severance might and should have been set forth as elements or constituent parts of the offence. But otherwise, and as it was, we think, correctly ruled by the court, if the pregnancy ceased when the child was removed from the body of the mother, the averment of violence by the hand of the defendant at that period constituted no part of the description of the acts prohibited by the statute, and was therefore an immaterial and superfluous statement. For this reason they should be, as they were by the presiding judge at the trial, rejected as surplusage. *Commonwealth* v. *Pray*, 13 Pick. 359. *Commonwealth* v. *Simpson*, 9 Met. 138.

Rejecting the averments of violence by the hand of the defendant upon the person of Webster, the indictment charges that he used instruments and means, and administered ergot maliciously and without lawful justification, with intent to cause and procure the miscarriage of a woman then pregnant with child. This is not, as is supposed in the objection argued in his behalf, an averment or accusation of the commission of distinct offences, but of one offence, in the use of some of the different means prohibited by law. The statute inhibits the use of " any means whatever " to procure, without lawful justification, a miscarriage and abortion. Many expedients may be resorted to and employed for this purpose, and several distinct and separate processes and operations may be actually used to accomplish it. It is a well settled principle that when a statute makes two or more distinct acts, connected with the same transaction, indictable, each one of which may be considered as representing a stage in the same offence, those which are actually done in the course and progress of its commission may be coupled in one count. Whart. Crim. Law, § 390 & cases cited. This principle has often been recognized and sanctioned in this court. In the case of *Commonwealth* v. *Eaton*, 15 Pick. 273, an indictment charging the defendant with " selling and offering

for sale" lottery tickets, upon a statute prohibiting each of those acts as a separate offence, was held upon demurrer not to be obnoxious to the objection of duplicity. So where a statute made the "receiving or aiding in the concealment of stolen goods, knowing the same to have been stolen," a punishable offence, it was held that an indictment charging the defendant with receiving and aiding in the concealment of such goods was not double, but charged only a single offence. *Stevens* v. *Commonwealth*, 6 Met. 241. See also *Commonwealth* v. *Hulbert*, 12 Met. 446; *Commonwealth* v. *Harney*, 10 Met. 422; *Commonwealth* v. *Simpson*, 9 Met. 138. Upon this principle it is clear, that the indictment, charging the defendant Brown with administering ergot and using instruments with intent unlawfully to procure miscarriage, and thereby actually procuring it, sets forth only one offence, and therefore is not objectionable on the ground of duplicity.

The ruling of the court, and the instructions given to the jury in reference to this part of the indictment carefully guarded the rights of the defendant, and were more favorable than those to which he was legally entitled. The case was put to the jury solely upon the evidence on the question of the use of instruments ; whereas, in passing upon the issue, it would have been competent for them to have taken into consideration also the evidence tending to show the administering of ergot for the purpose of producing the same general effect and result for which the instruments were used.

Besides the objections argued against the sufficiency of the indictment, exceptions were taken by the defendant to several of the rulings, and omissions to rule in conformity to his request at the trial. But none of these exceptions show any inaccuracy in the statement of the law, or afford any reason for disturbing the verdict. The parts of the person upon whom instruments were alleged to have been used for the purpose of procuring an abortion, which had been preserved, were properly allowed to be submitted to the inspection of the jury in connection with the testimony of the physician who made the *post mortem* examination. This is in conformity to the usual prac-

tice and course of proceeding, which is not of unfrequent occur-
rence in capital cases, where a homicide is alleged to have been
effected by means of poison.    Many instances of this kind have
occurred within the knowledge and under the sanction of this
court.

The acts and declarations of Stokes and Emerson as confed-
erates with the defendant in the execution of their common
design and object must, under the rulings and instructions of the
court as they are reported, have been admitted in evidence solely
with reference to the allegations in the second count of the in-
dictment, upon which there was a verdict of acquittal.    In that
view, the question of the admissibility of this evidence would
now be immaterial.    But upon the broader ground of the regu-
larity of the proceedings and the competency of the evidence,
there is really no room for doubt.    The conspiracy of the parties
was first satisfactorily made to appear to the court; and then
the question whether they did confederate in a common design,
and whether the acts and declarations of which proof were offered
were done and said in pursuance and execution of it, were left
to the determination of the jury.    Under such restrictions the
evidence was undoubtedly competent.    1 Greenl. Ev. § 111.

The instruction prayed for by the defendant, that the jury
could not convict if they were satisfied, upon the evidence, that
the abortion was procured by him by the use of some one of the
means mentioned in the indictment, unless they were able also
to determine by which of those means it was produced, was not
given in the very terms asked for; but was given in substance,
by the direction that the case went to them solely on the ques-
tion of the use of instruments, and that they were to convict
the defendant only upon satisfactory proof that the abortion
was produced in that manner and by those instruments.    It is
never necessary that the court should adopt the exact phrase-
ology of the party desiring specific instructions.    It is always
held to be sufficient that those given do actually conform, clearly
and distinctly, in substance and effect, to the proposition asserted.

The instructions respecting the effect of removing the after-
birth, and of the acts and declarations of the defendant subse-

quent to the abortion, were stated with precision and accuracy, and were accompanied by suitable and appropriate explana- tions; and being pertinent to the point in issue, they were rightly given to the jury. *Exceptions overruled.*