1. Whether it was erroneous to overrule the plaintiffs' challenges propter affectum as to five named jurors, the grounds of the motion for a new trial complaining of the judge's rulings do not require a reversal, since it does not appear that the plaintiffs were thereby compelled to exhaust their peremptory challenges in getting rid of such jurors, so that they could not challenge other objectionable jurors, if any. Cochran v. State, 113 Ga. 736 (3) (39 S.E. 337); Ethridge v. State, 163 Ga. 186 (1 b), 190 (136 S.E. 72); Faulkner v. State, 166 Ga. 645 (6) (144 S.E. 193); Felker v. Johnson, 53 Ga. App. 390 (186 S.E. 144).
(a) The allegations in the motion for new trial, that the judge erred in holding that the five jurors were not disqualified "caused it to become the duty of [the plaintiffs'] attorneys in the trial of the case to exhaust four strikes in removing four of said jurors from the panel and to accept juror J. E. Shaw," did not show affirmatively that the plaintiffs had exhausted their peremptory challenges within the rule above stated. Compare Patterson v. Collier, 77 Ga. 292 (3) (3 S.E. 119); Johnson v. State, 196 Ga. 806 (3 a) (27 S.E.2d 749).
2. Since the jury found that the plaintiffs were not entitled to recover any sum, it is immaterial whether the judge erred in excluding evidence by which they undertook to show that the property in question was of greater value than the amount recited as consideration in the deed from their father to the defendants, or in charging the jury in such manner as to limit the basis of recovery to the amount stated in such deed. McBride v. Georgia Railway Electric Co., 125 Ga. 515
(54 S.E. 674); Tyus v. Duke, 178 Ga. 800 (6) (174 S.E. 527); Mayes v. Simons, 189 Ga. 845 (2) (8 S.E.2d 73, 130 A.L.R. 245); Werk v. Big Bunker Hill Mining Corp., 193 Ga. 217 (2), 223 (17 S.E.2d 825).
3. "A witness who is not an expert upon the subject of insanity cannot testify to an opinion that a given person is insane, without stating the facts upon which his opinion is based." Welch v. Stipe, 95 Ga. 762 *Page 691 
(22 S.E. 670); Livingston v. Barnett, 193 Ga. 640 (3) (19 S.E.2d 385). "A ground of a motion for new trial must be complete in itself." City of Jackson v. Wilson, 146 Ga. 250
(4) (91 S.E. 63); Stovall v. New York Underwriters Ins. Co., 182 Ga. 163 (3) (185 S.E. 241).
(a) Tested by the foregoing, the ground of the motion for a new trial complaining that one of the plaintiffs, as a witness, was not permitted to answer the question, "Was your father, on the 28th day of August, 1939, in a mental condition to have understood the nature of the transaction and to have known what he was doing when he signed a deed to your brothers [and] he transferred all of his property to your brothers for thirty thousand dollars?" does not show error, since the question, so far as shown in this ground, sought to elicit a mere conclusion from a non-expert witness.
4. The right of a party to a thorough and sifting cross-examination as to witnesses called against him is not infringed by confining such examination to matters that are relevant to the issues in the case. Daniel v. State, 182 Ga. 875 (2) (187 S.E. 36); Clifton v. State, 187 Ga. 502
(4), 508 (2 S.E.2d 102); Granison v. State, 49 Ga. App. 216
(174 S.E. 636); Stevens v. State, 49 Ga. App. 248
(2) (174 S.E. 718). Under this rule, ground 6 of the motion for a new trial, complaining because the court did not allow counsel for the plaintiffs to cross-examine a witness for the defendants, does not show error.
5. The judge did not err in refusing to allow one of the plaintiffs to testify that a named physician who treated the witness's father during his last illness, stated to the witness that the father did not even have the mind of a child, since the testimony would have been hearsay. Augusta Factory
v. Barnes, 72 Ga. 217 (6) (53 Am. R. 838).
6. The court did not err in excluding the testimony of one of the plaintiffs that she and her sisters went freely and voluntarily to the office of the attorney who later represented them, and she considered that he was serving them on a contingent fee as a matter of justice to them, such testimony being irrelevant to any issue in the case.
7. Nor was it error to exclude the testimony of one of the plaintiffs on direct examination, that one of the defendants, her brother, had embarrassed her by calling her a vile name, and that she cried. While hostile feelings between the parties may ordinarily be shown, testimony as to the details of particular transactions and conversations is not admissible for that purpose. Carter v. Dixon, 69 Ga. 82 (7); McDuffie v. State, 121 Ga. 580 (7) (49 S.E. 708); Durham v. Durham, 156 Ga. 454 (2) (119 S.E. 702); Eugee v. State, 159 Ga. 604 (126 S.E. 471).
8. The charges on the question of ratification by the plaintiffs' father during lucid intervals were not erroneous as being unsupported by the pleadings and the evidence. The same is also true of the charge on the issue as to ratification by the plaintiffs after their father's death. Code, § 20-206; Williford v. Swint, 183 Ga. 375 (2), 377 (188 S.E. 685); McClure Realty Investment Co. v. Eubanks, 151 Ga. 763 (108 S.E. 204); Brown v. Carmichael, 152 Ga. 353
(3, 4) (110 S.E. 3).
9. The evidence was sufficient to authorize the verdict for the defendants, and under the preceding rulings, it does not appear that any reversible error was committed during the trial. Accordingly, the court did not err in refusing a new trial. *Page 692 
10. The conclusion stated in the preceding note will stand as to the entire case, notwithstanding it appeared from the pleadings and the evidence that the father died leaving an estate consisting of personalty, that is, property which had not been conveyed to the defendants by the warranty deed in question, but of which the defendants appeared to have had custody since his death.
(a) If the plaintiffs had sustained their contentions as to the real property conveyed by their father to the defendants, equity, in order to do complete justice, might have dealt with such personal estate in the same action, even without an administrator. Code, § 37-105; Eagan v. Conway, 115 Ga. 130
(3) (41 S.E. 493). However, since the jury found against the plaintiffs as to all other property, they were not, under the pleadings and the evidence, entitled to a verdict solely as to such personal estate. "As a general rule, heirs can not in this State have an equitable accounting for personal property of their ancestor, even though there may be no administration." Smith v. Smith, 141 Ga. 629 (7) (81 S.E. 895). See also the Code, §§ 37-120, 113-901; Brown v. Mutual Life Insurance Co., 146 Ga. 123 (90 S.E. 856); Denny v. Gardner, 149 Ga. 42 (99 S.E. 27); Hadaway
v. Hadaway, 192 Ga. 265 (3) (14 S.E.2d 874); and note especially the ruling in Harrell v. Fiveash, 182 Ga. 362
(2) (185 S.E. 327). The decisions in Dean v. Central Cotton Press Co., 64 Ga. 670, 674, and McGowan v. Lufburrow, 82 Ga. 523 (9 S.E. 427, 14 Am. St. R. 178), dealt with cases in which executors were parties. Compare Goff v. National Bank of Tifton, 170 Ga. 691
(153 S.E. 767).
(b) A recovery as to such personal estate would not have been authorized under the Code, § 113-1102, relating to executors de son tort, since the petition contained nothing to indicate that the defendants had assumed to exercise any of the duties of a legal representative with respect to such property, or that the plaintiffs intended to rely upon any such cause of action, it being alleged in effect that the defendants were holding the property adversely. Willingham v. Rushing, 105 Ga. 72 (31 S.E. 130).
11. Nothing ruled above shall prejudice the right of the plaintiffs through appropriate proceedings to share as heirs at law in such personal estate of their deceased father.
Judgment affirmed on the main bill of exceptions; cross bill dismissed. All the Justices concur.
 Nos. 14912, 14913. DECEMBER 1, 1944. REHEARING DENIED DECEMBER 13, 1944.
On January 22, 1943, Mrs. Margaret Robinson, Mrs. Ruby Wheeler, Mrs. Marie Parker, and Mrs. Lilly Sharpe filed a suit in equity against G. W. Murray, M. A. Murray, and A. W. Gragg, alleging that the plaintiffs and their two brothers, the defendants Murray, were the children and sole heirs at law of F. M. Murray, who died intestate on November 21, 1940, his wife having predeceased him; that more than a year before his death, to wit, on August *Page 693 
28, 1939, F. M. Murray executed to his two sons, the defendants G. W. Murray and M. A. Murray, a deed purporting to convey all of his real estate, consisting of about 2800 acres of land in Long County, and the greater part of his personal property; but that such deed was subject to certain "trust conditions" stated in the petition, by reason of which the plaintiffs were entitled to an accounting and other relief in equity. It was alleged that the defendant Gragg had purchased from the defendants Murray the timber on the land in question; but on the trial a nonsuit was granted as to him, and no exception having been taken to that judgment, the case stands as one solely between the four daughters of F. M. Murray, deceased, as plaintiffs, and the two sons as defendants. These defendants filed general and special demurrers to the petition. The plaintiffs amended their petition to meet the grounds of special demurrer. The general demurrer was then renewed and overruled. The defendants excepted pendente lite. They also filed an answer. The jury found a verdict for the defendants. The plaintiffs' motion for a new trial, based on the usual general grounds and numerous special grounds added by amendment, was overruled, and they excepted. The defendants then sued out a cross-bill of exceptions, assigning error upon the order overruling their general demurrer and on their exceptions pendente lite as previously taken to such order.
The deed, a copy of which was attached to the petition, recited a consideration of $30,000 for the land and personalty therein described, and was in the form of an ordinary warranty deed except that it contained, in conclusion, the following reservation: "However, the said party of the first part herein reserves the right to the use of the home, jointly with grantees herein, as a place of residence so long as he shall live and/or cares to so occupy the same and use the same, and to have the use of as much of the cleared lands as may be agreed upon and desired for making crops, and the use of mules, plows, etc., necessary in making said crops, without the charge of any rental therefor."
The petition as amended contained substantially the following allegations: The land was worth $40,000 and the personalty $8000. The grantor owned the following personalty in addition to that described in the deed: one Chevrolet sedan automobile, worth about $600, and notes, accounts, and choses in action of the value *Page 694 
of about $2500, an itemized statement of which cannot be given by the plaintiffs, because all data pertaining thereto is in the possession of the defendants. No cash was paid for the deed; the true consideration being an oral agreement, made by the grantees with the grantor, that they would take the real and personal property and manage and control the same during the life of the grantor, paying to themselves fair compensation for the services to be rendered by them and giving to the grantor a support and maintenance out of the income, rental, and proceeds of the property, and all medical, surgical, and nursing care and attention which his condition might require during the remainder of his life, and upon his death would divide the real and personal property equally and in kind among the six heirs; and should such division be found impracticable, then they would convert the property into cash at the least expense and on the best terms to be secured, and, from the proceeds so converted into cash, divide the net proceeds thereof equally among the six children, so as to avoid an administration in the court of ordinary. The said F. M. Murray, the grantor, thought and believed that the language used in said warranty deed conveyed and included his real purpose and intention in executing the same, and that the real consideration for said deed, as above recited, would be faithfully carried out by said defendants.
About a year before the deed was executed on August 28, 1939, and at other times, the grantor father expressed to his sons, the grantees, the wish that his property might be so taken and applied by them, to which they assented, he being at all such times mentally competent; but, when the deed was executed, he was not capable of understanding its terms, although the defendants knew that they were accepting the deed under the trust conditions above stated. The fair compensation which the defendants knew that the grantor expected them to receive, was $100 per month for management, less $25 per month for the use of the farm and outbuildings from the date of the deed, and $30 per month for the services of an accountant and bookkeeper. After such conveyance by warranty deed, the sons executed to their father a security deed for $20,000, "to show that the warranty deed was made on a monetary consideration and not for the purpose of carrying out the trust conditions, as above recited, in the administration of the estate," *Page 695 
which security deed was recorded on August 29, 1939, and "was a part of the scheme of said defendants to secure possession of the estate . . for the use and benefit of [themselves], and to avoid carrying out of the trust conditions under which the warranty deed was made on the 28th day of August, 1939." Thereafter, the defendants endeavored to borrow money by giving a second security deed on the real estate, but were unable to do so on account of the security deed for $20,000, which they had given to their father. They then prevailed upon him to enter a cancellation of said security deed, by representing to him that it would be to the best interest of all the heirs and conducive to economy in operating the farm and turpentine business for money to be borrowed on the real estate. Because of his feeble health, both mental and physical, he was unable to resist their importunities, and consented to execute a cancellation of his security deed, and did execute the same on January 31, 1940, which cancellation was entered of record on February 6, 1940. Later, the defendants obtained the consent of their father to join in executing a security deed to Jefferson Standard Life Insurance Company for a loan of $8000. In order to secure the signature of their father to this deed, the defendants represented to him that they could not successfully carry out "his wishes in trust by them to be performed" unless the money was so borrowed, since with the cash in hand the property could be operated with less expense than through borrowing from a naval-stores factor, and by further representing to him that the interest of all the heirs would be promoted by advancing to each of them some needed money for their personal use, that is to say, $1000 to each of the sons and $500 to each of the daughters, thus leaving for operating capital $4000 to be used by the defendants in carrying out the "trust conditions." The signature of the father to the Jefferson Standard Life Insurance Company was obtained on February 13, 1940, and the loan from that company was then accordingly obtained. During the month of March following, each of the daughters was paid the sum of $500 in cash by the defendants; but in accepting said cash the petitioners (the daughters) "were in no way consenting to the claim later made by said defendants that they were paying them a part of the purchase-price of their father's estate." A further representation, made by the defendants to their father to secure his consent to *Page 696 
mortgage the property, was that they would execute a second deed to secure debt to him for the sum of $13,000, and he could transfer said second deed to secure debt to the petitioners as security that the defendants would faithfully carry out the trust conditions imposed by the warranty deed of August 28, 1939; also, that they, the daughters, should be permitted to collect the notes, accounts, and other indebtedness, including two described items of indebtedness amounting to $1800. The defendants, soon afterwards, and subject to the existing security deed in favor of the Jefferson Standard Life Insurance Company, executed to their father such second security deed for an expressed consideration of $13,000. This deed was never transferred by their father to the petitioners, nor have they been permitted to collect any of the notes, accounts, or choses in action due to their father, since all books of account and data respecting the same are in the hands of the defendants. In March, 1940, the petitioners learned of the loan from Jefferson Standard Life Insurance Company; and in July, 1940, the defendants "insisted to your petitioners . . that said $13,000 deed to secure debt represented the entire amount which your petitioners would receive in full out of the estate of their father and in fulfillment of the trust conditions imposed by their father." In December, 1941, the defendants executed to A. W. Gragg a timber deed to the timber on said land, but the petitioners did not know of that transaction until after the timber deed had been placed on record, "and after the defendants had paid to each of your petitioners the sum of $2750 in cash, and exacted of petitioners, upon said payment, that they join with the defendants in executing a cancellation of record of the $13,000 second deed to secure debt executed by the defendants in favor of the said F. M. Murray. Petitioners did join with defendants in executing said cancellation, but did so only for the purpose of furthering the settlement and adjustment of the estate of their father under the trust conditions imposed under said warranty deed, and not for the purpose and intention of relinquishing further claim on the defendants in the winding up of the estate of their said father. The said defendants well knew that such was the purpose and intention of petitioners, as the defendants had submitted to them, in September of 1941, a receipt, the purport of which was acknowledged[?] that they would release all claim against the estate of F. M. Murray, *Page 697 
deceased, upon the receipt by them of the aggregate sum of $13,000, which receipt petitioners declined to sign."
The timber deed to A. W. Gragg recited a consideration of $6000 cash, and that the defendants are to receive from said Gragg an additional sum of $6.50 per thousand for all timber cut and removed in excess of 3,000,000 feet.
The petition as amended further alleged: The defendants have violated the trust conditions and agreement under which the warranty deed aforesaid was executed to them, and are seeking to appropriate to their own use and benefit all equity in the estate of their father, F. M. Murray, deceased; whereas, in equity and good conscience, they have not at any time the right to appropriate to themselves more than one-sixth part of said estate, and a reasonable allowance to them for the services to be rendered by them in the winding up of the estate, without the expense of administration in the court of ordinary. But the amounts which the said defendants have secured from operating the property and in committing waste on the property are unknown to your petitioners, and petitioners are unable to arrive at the value of the property so appropriated, and the value of property to which the defendants may now be entitled, without an accounting in equity with said defendants. Said defendants, in continuing to claim that they own absolutely all the property of the estate of F. M. Murray, deceased, free and clear of all trust conditions in favor of the petitioners, are perpetrating a fraud upon them.
In order that the plan and purpose of the deceased father, F. M. Murray, for the administration and distribution of his estate may be carried out and the rights of the petitioners may be protected, a court of equity should intervene in their behalf and should take possession of all the said property and, through a receiver appointed by the court, operate the property, and should, under the order and direction of the court, divide the property in kind, equitably among the six heirs; and, if such division be found impracticable, then should convert the property into cash and make distribution of the same equitably among the six heirs, deducting from the one-sixth part coming to each of the said defendants the amount already received by each of them; and if the amount already received by each of them should be in excess of a one-sixth distributive part, then your petitioners should have judgment *Page 698 
against the said defendants for whatever amount may be due and payable to them because of the breach of trust on the part of the said defendants.
It was further alleged that the $30,000 consideration, placed by the defendants in the warranty deed, was on the basis of the net value of the estate after all expenses, debts, and reasonable compensation to them had been paid, besides expenses of sickness, support, and maintenance of the father; that, after such deductions, there would be $30,000 for division among the six heirs, that is, $5000 to each; for which the defendants executed the $20,000 security deed, to represent $5000 to each of their four sisters; but that the defendants have deviated from this original plan by endeavoring first to take $5000 each for themselves, and deduct from the $20,000 security deed all the estimated expenses of $7000, so that the shares of the sisters would be reduced to $13,000, instead of the original plan of the defendants for such expenses to be borne by the defendants out of the equity in the property above the cash consideration of $30,000 named in the warranty deed. It was further alleged that in cancelling the $20,000 security deed, the father did not have the mental capacity to comprehend the legal effect of such act; that the petitioners had no part in such cancellation, nor in the $8000 loan, nor in the $13,000 security deed, and they have not approved or ratified any of the same; and that the defendants have collected and appropriated all amounts due the estate except the aggregate of $13,000 received by the plaintiffs and claimed by the defendants "to be the full amount to be divided equally among the four plaintiffs."
The petition contained the following prayers: (1) "That the trust conditions heretofore recited for the administration of the estate of F. M. Murray, deceased, be enforced and carried out in a court of equity;" (2) that an accounting be had in equity between the petitioners and the defendants; (3) that an injunction issue to restrain the defendants, their servants, and agents, from cutting any of the timber on said property; (4) that a receiver be appointed to operate the farm and the turpentine business so long as the court may deem such operation advantageous, and to divide the property in kind equitably among the six heirs, or to convert the property into cash and to make such division of the proceeds; (5) for general relief. *Page 699 
In their answer, the defendants denied all allegations as to wrongful acts by them, and as to mental incapacity of the father. The defendants also alleged substantially the following: The warranty deed represented an outright purchase and sale, in accordance with an agreement between the defendants and their father, under which they executed the $20,000 security deed as "a plain obligation . . which was paid to and cancelled by their father in his lifetime." On February 28, 1940, the defendants paid their father $7000, by paying $4000 of his obligations, to wit, $3000 to a naval stores company, and $1000 due by him for taxes, and by delivering to him $3000 in cash for his personal use. For the remaining $13,000, they executed to him the second security deed. The $8000 loan obtained from the insurance company was for the purpose of enabling them to make these payments and to pay the four plaintiffs $500 each, which was paid during the father's lifetime. Besides this amount, each of the petitioners was paid the sum of $2750 on February 2, 1942, making a total of $13,000 paid to the plaintiffs. All money received from the timber sale to Gragg was used in making the payments of February 2, 1942. On receipt of these payments, each of the petitioners wrote an acknowledgment of payment in full on the back of each of the unpaid notes which had been given to the father in connection with the $13,000 security deed, and also signed an order for the cancellation of that deed. In order to save the cost of administration, and after a full discussion between the defendants and their father, the warranty deed was executed, in consideration of the defendants' obligation to pay the sum of $20,000 secured by the first security deed, "all of which was to be paid to and be equally divided between petitioners, except such amounts as would be necessary to pay the debts" of the father "and take care of him as long as he lived." The defendants have fully complied with this agreement. In addition to the $3250 received by each of the plaintiffs, the defendants have, as was expressly desired by the father, allowed the plaintiffs to take the furniture, worth $1000 or more. During the lifetime of the father, the defendants explained the whole transaction to the plaintiffs.
The answer further alleged that, at the death of the father, he "left on hand, unexpended, $1490.97, which amount now belongs to his estate," an automobile worth about $125, and a note due by *Page 700 
one Wheeler and secured by a deed to a house and lot for $500 plus interest; that the defendants "are now in possession of said money, car, and Wheeler claim, and are ready to divide the same with the petitioners or turn the same over to an appointed administrator for disposition;" that their father in his last days requested that "the cash left by him be given to religious causes," and this has been discussed with the petitioners, but no decision has been made; that "these three items, all of the property that defendants know of belonging to the estate of their father, may be disposed of at any time, and no litigation or administration is necessary, as there are now no unpaid obligations against their father's estate;" and that a receivership is wholly unnecessary, as the defendants bought and paid for the property conveyed by the warranty deed, and are solvent and able to respond to a judgment for any reasonable amount.
On the trial, the evidence as a whole showed that, before and at the time of the warranty deed and the other transactions in 1939 and 1940, the father was suffering from a severe attack of shingles, was very nervous, and in ill health. For the plaintiffs, there was testimony to the effect that throughout this period, he did not have sufficient capacity to understand the nature of the warranty deed, or the other instruments that were executed. On the other hand, there was evidence for the defendants to the effect that he had sufficient mental capacity at the times of all such transactions.
As to the moneys received by the plaintiffs, it was undisputed that, during the father's lifetime, each received $500 from the proceeds of the loan obtained from the insurance company; and that each of them afterwards received the additional $2750, made entries acknowledging payment on the notes secured by the $13,000 deed, and signed an order for the cancellation of such deed. The cancelled checks indorsed by and paid to the plaintiffs were in evidence. On the margin of each check for the amount of $2750, was written: "Bal. in full as per notes."
As to the nature of the trade between the defendants and the father, the defendants' testimony supported the essential averments of their answer, as above stated. The defendant G. W. Murray testified that, in the trade with their father, he allowed them to deduct, from the $30,000, the recited consideration for the warranty deed, "$5000 each for our part of the estate . . and we *Page 701 
could pay him $20,000 for it, and that [the $5000 each] would be our share; that he wanted the daughters to have everything else, wanted his daughters all paid. He said that he wanted to pay all his expenses while he was sick and all hospital bills or nurse bills; if it took all, he wanted them paid, because he wanted to be clear as long as he lived, and then he wanted the daughters to have everything else."
As to the approximately $1500 cash on hand, the same defendant testified that he was willing to turn it over to the church; that "it is true that, if that money is given to the church, the girls in a way will be giving all of it, but that was Papa's wishes, I had nothing to do with it." But he later testified, "My father said that he wanted his bills and indebtedness all paid and wanted the balance to go to the girls."
The other defendant, M. A. Murray, testified: "As to the remainder of the $3000, which is approximately $1500, and an automobile and the notes which are secured by a deed to secure debt, we are willing for that to be handled any way; we never have tried to keep it; we just couldn't agree on how to distribute it; we are perfectly willing to turn it over to the court and willing for counsel for either side or both sides to divide it; it is not ours; it can be disposed of any way the court sees fit. . . I have only collected $5 on an account, and that was from Med Davis, and I am willing to turn that into the estate any time they want it."
There was some testimony that the father had valued his property at about $48,000, and that such was its true value. There was other evidence that it was not worth even as much as $30,000, this being the amount recited as consideration in the warranty deed.
The special grounds, added by amendment to the plaintiffs' motion for a new trial, were substantially as follows:
In ground 1, it was shown that, before proceeding to strike a jury, the plaintiffs had requested that the jurors be placed on their voir dire, which was done. From this examination, it appeared that three of the jurors, E. A. Moran, J. E. Shaw, and W. E. Floyd, were members of Elim Baptist Church; that D. B. DuBose and J. C. Letcher were members of Jones Creek Baptist Church; and that M. A. Murray, one of the defendants, was a Baptist minister and the pastor of each of the said churches; that he was paid a salary by each of these churches, and each of said five jurors contributed *Page 702 
cash toward the payment to him of the salary "paid by the respective church of which each juror was a member;" and that each of said jurors felt a close and friendly relationship to the defendant as the pastor, but each contended, nevertheless, that none of these facts would have any effect on his verdict or render him prejudicial or biased in the case. Upon these facts, the plaintiffs contended that each of said jurors was disqualified propter affectum, especially since the character of the said defendant pastor was attacked for truth, honesty, and fair dealing in the administration of an alleged trust relationship. The judge held that the five jurors were not disqualified propter affectum. The plaintiffs contended that the court, in holding that the said five jurors were not disqualified propter affectum, caused it to become the duty of their attorneys in the trial of the case to exhaust four strikes in removing four of the said jurors from the panel, and to accept J. E. Shaw on the jury, although, as counsel contended, he was disqualified to serve as a juror in the trial of the case; and that the court thereby, as plaintiffs then contended and now contend, committed reversible error against the plaintiffs, and through said reversible error a verdict for the defendants was found by the jury.
In ground 2, a similar contention was made with reference to three of the same five jurors, namely, Moran, Floyd, and DuBose, except that it was further shown that each of these jurors bore to the defendant, M. A. Murray, the further relationship of deacon in the respective churches of which they were members; and each, "as such deacon, was required to administer the finances of his said church and assist the pastor, the defendant, in serving the spiritual needs of said church; and, as plaintiffs further contended, that, since the character of said pastor for truth, honesty, and fair dealings was attacked in administering a trust relationship, which they claimed arose between himself and the four sisters under the warranty deed, the said deacons, for all of said reasons, were disqualified, propter affectum, to serve as jurors in the trial of said case; notwithstanding the fact that each of said deacons contended that the relationship of church member and of deacon to the pastor would not have any effect on his verdict or render him prejudiced or biased in the case, even though the financial interests of said pastor were involved; and for all of said reasons, as church members and as deacons, the said deacons were disqualified, propter affectum, to serve as jurors in the trial of said case. *Page 703 
"The court ruled that the said three deacons were not disqualified, propter affectum, and that he would not hold either of them disqualified on the panel of twenty-four jurors put upon the plaintiffs in the trial of the case, and directed that counsel should proceed to strike the jury. Plaintiffs' attorneys, in striking the jury from the panel of twenty-four, exhausted three strikes in removing the said three deacons from the trial jury, and plaintiffs contend that the court, in holding that said three deacons were not disqualified propter affectum, made it necessary for the plaintiffs to exhaust three strikes in removing the three deacons from the panel, when a competent jury to try the case could have been secured out of the panel of . . jurors available for service on the jury; and that the court thereby committed reversible error against the plaintiffs, and through said reversible error a verdict for the defendants was found by the jury."
In grounds 3, 5, and 8 (being the second ground numbered 8), the movants complained of rulings of the court excluding evidence by which they undertook to show that the property deeded by their father to the defendants on August 28, 1939, was of the approximate value of $48,000, or was in any event of greater value than $30,000, the amount recited as consideration in such deed.
In ground 4, it was contended that the court erred in refusing to allow one of the plaintiffs as a witness to answer the question: "Was your father, on the 28th day of August 1939, in a mental condition to have understood the nature of the transaction and to have known what he was doing when he signed a deed to your brothers [and] he transferred all of his property to your brothers for thirty thousand dollars?" The court was advised that, if the witness were permitted, she would answer the question in the negative. The defendants' objections were that the answer would be a conclusion, since the witness was not at the home of her father at that time, and further "because it is a transaction and communication with the deceased, and she is testifying in her own behalf against the grantee of the deceased."
In ground 6, it was contended that a new trial should be granted: "Because, when W. E. Floyd was called from the jury box to the witness stand as a witness for the defendant and was being interrogated on cross-examination by counsel for the plaintiffs, the following colloquy occurred and the following ruling was made *Page 704 
by the court, to wit: Q. You are a member of the jury here? A. Yes. Q. When you qualified as a juror in this case, you stated you had no prejudice or bias in this case, either for or against either party; you knew then you were going to be a witness? A. I did. Q. And you knew if you were going to be a witness, you were going to testify in favor of these defendants? A. I was going to testify what I knew. Q. And you knew that what you knew as a witness would be in their favor? A. I didn't know whether it would or not; I am not familiar with the case." On objection of counsel for the defendants to this line of questioning, a colloquy took place between the judge and the attorneys, which colloquy concluded as follows: "Court: You can ask him if he is prejudiced or biased; but you are going into the question here of him being a juror and as to his competency. The mere fact that he is a juror doesn't prevent him from being a witness, or from being unbiased or unprejudiced. Mr. Oliver: I am attacking him as a juror and as a witness. Court: Proceed with the witness. I don't care to have any further discussion."
The movants contended that the court, in thus forbidding counsel for the plaintiffs to interrogate the witness further as to his bias and prejudice in the case against the plaintiffs and in favor of the defendants, he being both deacon and a member of the church of which Reverend M. A. Murray was pastor, committed reversible error against the plaintiffs.
In ground 7, it appeared that, when one of the plaintiffs was on the witness stand, she was asked the question: "What about your father's mental condition?" and answered: "Well, my authority is in the courtroom, Dr. Middleton;" and was further asked: "What did he tell you about his mental condition?" At this point, the judge upon his own motion ruled that the attorneys for the plaintiffs could not go into a conversation with Dr. Middleton; and although it was stated by counsel that, if the witness were permitted to answer further, she would testify that Dr. Middleton, who had attended her father during his illness, had stated to the witness that her father "didn't even have the mind of a child," the judge still would not permit the witness to testify to such statement.
In ground 8, being the first ground numbered 8, it was contended that the court erred in not permitting one of the plaintiffs, *Page 705 
as a witness, to answer the question: "Mrs. Wheeler, there has been some question asked about you and your sisters employing a lawyer. Did you or not come to my office freely and voluntarily?" The judge interposed the statement that he considered that there was no contention "as to that, let's stick to the issue. Mr. Oliver: There was some question raised because my clients did not have a large estate and [were] not able to pay me a cash fee and I had to take a part of it on a contingent fee, that I was doing something wrong. Court: I don't think anything of that kind has been indicated, let's be fair, that question was asked and it was proper." The court was informed that Mrs. Wheeler, if permitted, would testify that she and her sisters went to Mr. Oliver's office freely and voluntarily, and she considered that he was serving them on a contingent fee as a matter of justice to them.
In ground 9, it was shown that one of the plaintiffs, recalled in rebuttal, was interrogated and answered as follows: "Q. Did your brother embarrass you by cursing you for a son of a bitch? A. Yes. Q. Did you cry? A. I did." Whereupon, the judge stated that he did not think this evidence as to the controversy between the brother and the sister was material to any issue in the case, and that he would exclude it. The movants assign error upon this ruling, contending that the evidence was material for the purpose of showing this defendant's utter disregard for the cordial, friendly, and loving relation which the father had intended should exist between the brothers and sisters.
In grounds 10, 11, 12, 13, 18, 19, and 20, the movants complained of excerpts from the charge of the court, which in effect limited the plaintiffs' right of recovery to the sum of $5000, less the sum of $3250 each had already received, which instructions were based upon the theory that the plaintiffs in their petition and evidence contended that, in the transactions between the father and the sons, the agreed purchase-price of the property was $30,000, $20,000 of which was to be paid to the plaintiffs, that is, $5000 to each of them, whereas they had received only $13,000, or $3250 each. The movants complained that these instructions were erroneous, in that they contended both in their pleadings and in their testimony that the property conveyed by the father to the sons under trust conditions was of the reasonable value of $48,000, that is, $40,000 for the realty and $8000 for the personalty; and *Page 706 
that each of the sisters was therefore entitled to recover from the defendants the sum of $8000, less the $3250 already received, or a net balance of $4750 to each of them, and not $1750, as indicated in the charges complained of.
In ground 14, the movants complained of a charge to the effect that, even though a party's mental faculties were impaired, so that at times he would be mentally incompetent to make a deed, yet if he had lucid intervals when he could understand the nature and effect of such an instrument, and if he signed a deed during such an interval, then he would be bound. It was contended that this charge was erroneous, because it was not authorized by the pleadings or the evidence as to any of the transactions between the father and the sons which were drawn in question.
Grounds 15 and 17 complained of charges similar to that referred to in ground 14, but submitting more specifically the question as to whether the warranty deed from the father to the sons was ever ratified by the former during a lucid interval; the grounds of complaint being substantially the same as those stated in ground 14.
In ground 16, the movants complained of the following charge: "The court charges you, gentlemen, in this connection, that if you should find, gentlemen, that if there had been any ratification of this transaction, either by F. M. Murray or by the plaintiffs in this case, that is, with full knowledge of the transactions, and at the time when doing so that F. M. Murray ratified and approved the transaction, then he would be bound and his heirs would be bound;" the contention being that such charge as to ratification was not authorized by any pleadings or evidence in the case, and that it amounted to an expression of opinion by the judge that the evidence would authorize a finding that there was such a ratification.