BIEGUN *v.* THE STATE.

No. 16985. FEBRUARY 16, 1950. REHEARING DENIED MARCH 15, 1950.

*John H. Hudson, J. Walter LeCraw,* and *Reuben A. Garland,* for plaintiff in error.

*Eugene Cook, Attorney-General, Paul Webb, Solicitor-General, William Hall,* and *J. R. Parham, Assistant Attorney-General,* contra.

ALMAND, Justice. P. D. Biegun was convicted of murder upon an indictment returned by a grand jury of Fulton County. The first count of the indictment, on which count the conviction was had, charged that the accused "on the 29th day of July 1949, with force and arms, did unlawfully, with malice aforethought, kill and murder Dorothy Martin, a pregnant woman, by committing an abortion upon her person, and by introducing into her female organs a substance to the grand jurors unknown, and by inserting and packing said substance into the female organs of said Dorothy Martin, and by using and employing an instrument and chemical and substance to the grand jurors unknown upon the person of the said Dorothy Martin, thereby causing and inflicting injuries and wounds upon the person of the said Dorothy Martin from which she died." The verdict recommended mercy, and the defendant was sentenced to life imprisonment. His motion for a new trial, based on the general grounds and 11 grounds added by amendment, was overruled, and he excepted.

Grounds 4, 5, and 6 of the motion for new trial will be considered together. It is complained that the court erred in allowing one Chaffin, a witness for the State, to relate a separate and distinct transaction occurring in June, 1948, as to an abortion performed by the defendant on the wife of the witness. Chaffin was permitted by the court to testify that in June, 1948, he went to the defendant's home at Hapeville for the purpose of getting

620

the latter to perform an abortion on his wife. The defendant agreed to perform the abortion for a consideration of $65, which the witness paid. Subsequently the witness carried his wife to the defendant's home, where he left her with the defendant, and shortly thereafter he returned and carried her to his home. After leaving the home of the defendant the witness's wife became nauseated and suffered pain, and the witness removed from her female organs about 60 feet of gauze and a rubber tube 6 inches long. His wife suffered such pain that he called a doctor, and she was removed to a hospital. The witness testified that her temperature was 104 degrees, and that penicillin and a blood transfusion were given her. While she was at the hospital the defendant visited her, and asked the witness why he had not called him when his wife started to have pain.

All of this testimony was objected to at the time it was offered, on the grounds that it was irrelevant and prejudicial, that it had no reasonable relation or relevance to the issue in the case, and that it was not shown to have been at any reasonable length of time in connection with the transaction then under investigation. Separate objections were made specifically to those parts of the testimony in which the witness related the giving of penicillin and a blood transfusion to his wife while she was in the hospital; the grounds of objection being substantially the ones stated above.

Though evidence of one crime is not admissible on the trial of a defendant for another crime where the sole purpose is to show that the defendant is guilty of such other crime, such evidence is admissible where there is some logical connection between the two transactions, from which it could be said that proof of the one tends to establish the other, or where evidence of similar transactions as to the nature of the crime committed and the methods employed shows a reasonable connection in point of time and place between the two, to show, against the defendant on trial, plan, scheme, or identity of parties in respect to the crime. *Cawthon* v. *State,* 119 *Ga.* 395 (5) (46 S. E. 897); *Andrews* v. *State,* 196 *Ga.* 84 (4) (26 S. E. 2d, 263); *Fuller* v. *State,* 197 *Ga.* 714 (1) (30 S. E. 2d, 608); *Gossett* v. *State,* 203 *Ga.* 692 (3) (48 S. E. 2d, 71). "If the method or scheme employed in the commission of the crimes of similar nature were the

same, this aids in identification, and proof of other such crimes is admissible." *Allen* v. *State,* 201 *Ga.* 391, 395 (40 S. E. 2d, 144). In *Dorsey* v. *State,* 204 *Ga.* 345 (49 S. E. 2d, 886), where the defendant was on trial for rape, evidence of assault with intent to rape on other women was held to be admissible. It was there said "The *modus operandi* here revealed is singular. . . . Since the testimony of extraneous crimes objected to does in fact show a similarity of method employed by the defendant, and since it reveals a definite state of mind evidenced by a common plan or scheme for gratifying his lascivious desires, under the rulings of law above set forth we conclude that the evidence was admissible as an aid in identification, since that issue was also involved by the defendant's denial that he had ever seen any of the females who testified against him." P. 350.

In the case now under consideration, there is a definite similarity of the manner in which the defendant conducted his operations in the *Chaffin* case and in the one on trial. In both cases, (1) the woman went to the home of the defendant on reference of third parties; (2) the defendant agreed to perform an abortion for a cash consideration; (3) the women were carried to the same place; (4) the defendant carried the woman into a room, and no one was present when the abortion was performed other than the defendant and the woman; (5) the defendant packed the cervix or womb with gauze; and (6) severe pain followed each operation.

We think that, the offense being the same, to wit, acts to perform an abortion on a pregnant woman, and the manner and method in which these attempts were committed being similar, evidence of such other abortion was admissible under the precautionary instructions which the court gave, to show intent, motive, scheme, and identification of the defendant. Particularly it was relevant on the question of identification, for the reason that the defendant, shortly after the death of Dorothy Martin, in answer to questions propounded to him by a police officer, denied that an abortion had been attempted, and stated that he did not put his hands on her, but that she fainted. *Guiffrida* v. *State,* 61 *Ga. App.* 595 (7 S. E. 2d, 34)

Nor do we think that the prior similar transaction was so remote in point of time as to exclude this evidence from con-

sideration by the jury. In *Fuller* v. *State*, 197 *Ga.* 714 (supra), on a trial for murder growing out of a robbery, evidence of an indictment for· robbery and a plea of guilty 16 months prior to the offense for which the defendant was on trial was held not to be inadmissible because too remote in time. In *Gossett* v. *State,* 203 *Ga.* 692 (supra), on a trial for murder by poisoning, evidence of a prior death by poisoning by the defendant 10 months prior to the offense was deemed not too remote. In King *v.* Lovegrove, 3 K. B. 643, evidence as to a prior abortion which took place 9 months previously was held to be admissible; and in People *v.* Morani, 196 Cal. 154 (236 Pac. 135), on a trial for murder resulting from an abortion, acts of abortion by the defendant, occurring three and a half years prior thereto, were admitted in evidence.

Nor do we think that it was error for the court to have permitted the witness to testify as to the method of treatment given his wife while she was in a hospital. The evidence of the abortion upon his wife being admissible, evidence of what treatment she received in the hospital growing out of the abortion was relevant to show the nature and extent of the injury that she had received from the unlawful act.

■ Ground 7 complains that the court erred in admitting in evidence and allowing to be opened and exhibited to the jury a cylindrical glass jar containing a human foetus with head, arms, hands, fingers, legs, toes and body, surrounded by certain other parts of the human body, identified as being portions of the body of Dorothy Martin, obtained as the result of an autopsy performed upon her after her death, the objections being: (a) the condition of the foetus and organs taken from the body of Dorothy Martin were not at the time of their exhibition to the jury in the same natural condition as when they were taken from her body; (b) they were not relevant to any issue in the case; (c) they had a prejudicial effect upon the jury.

The evidence disclosed that, about 28 hours after death, an autopsy was performed upon the body of Dorothy Martin by a physician and pathologist, together with a toxicologist and criminal pathologist. It appears from their testimony that, except for such changes as were due to the lapse of time, these parts of the body of the deceased were in the identical condition

they were in at the time they were removed from her dead body. They testified that in performing the autopsy they removed from her body the foetus, cervix, and vagina. They identified a discoloration on the cervix as being an unnatural condition, and the toxicologist gave it as his opinion that the discoloration was produced by passing some object through the cervix which produced a scratching or removing of the little tender cells of the cervix or neck connecting the vagina and the womb, which caused a hemorrhage, and there were found two blood clots, one on the cervix and one on the womb.

The indictment charged that Dorothy Martin was pregnant, and that she was killed by the defendant, who committed an abortion upon her person by wilfully inserting and packing a substance into her female organs, and by using and employing an instrument and chemical substance to the grand jurors unknown upon the person of the deceased, thereby causing and inflicting injuries and wounds from which she died. We think that those portions of her body which were in the jar offered in evidence, containing the foetus, vagina, cervix and womb, were admissible as real or demonstrative evidence to show: (a) the pregnancy of the deceased woman at the time of the alleged abortion; (b) the nature and kind of injuries inflicted upon her female organs; and (c) the age of the foetus. The State having charged the defendant with having committed an abortion upon the deceased by the insertion of an instrument or substance into her female organs, which produced the physical injuries causing her death, and the physician and toxicologist who performed the autopsy having testified as to the conditions they found in such organs, and it appearing that such organs contained in the jar were in the same condition as they were in at the time they were taken from her body, such evidence was of assistance to the jury in determining for themselves, upon viewing such parts of the body, whether there were actual injuries in the cervix and womb, and also the question of the pregnancy of the deceased and the age of the foetus. See, in this connection, Commonwealth v. Brown, 80 Mass. 419; People v. Hobbs, 297 Ill. 399 (130 N. E. 779); Gray v. State, 55 Tex. Crim. 90 (114 S. W. 635); 2 Wharton's Criminal Evidence (11th ed.), 1294, § 763; annotations in 12 L.R.A. (N. S.) 238, and 22 L.R.A. (N. S.) 513.

■ The refusal of the court to permit counsel for the defendant, on cross-examination, to ask a witness for the State whether the deceased woman did not tell him she was married and had a child, was not error, as complained of in ground 8. The right of counsel to cross-examination was not abridged by the court in refusing to allow irrelevant questions. *Pulliam v. State,* 196 *Ga.* 782 (2) (28 S. E. 2d, 139); *Robinson v. Murray,* 198 *Ga.* 690 (4) (32 S. E. 2d, 496).

■ Where the court fully defined direct and circumstantial evidence, and informed the jury under what circumstances they would be authorized to convict upon circumstantial evidence alone, the refusal of the following written request, "I instruct you that the case on trial is a case of circumstantial evidence," was not error, as complained of in. ground 9. *Owens v. State,* 139 *Ga.* 92 (1) (76 S. E. 860).

■ Neither under the evidence for the State nor under the statement and evidence of the defendant was the theory of involuntary manslaughter in the commission of a lawful act without due caution and circumspection involved. Therefore it was not error to refuse the defendant's request to charge this principle of law, as complained of in ground 10. See *Washington v. State,* 137 *Ga.* 218 (2) (73 S. E. 512); *Wright v. State,* 199 *Ga.* 576 (34 S. E. 2d, 879); *Johnson v. State,* 72 *Ga. App.* 534 (3) (34 S. E. 2d, 555).

■ Ground 11 complains of that portion of the court's charge where the jury were instructed, "When you come to consider count one of the indictment, and you first consider count one," and of another portion of the charge, in which the court instructed the jury that, if they believed beyond a reasonable doubt that the defendant did, with malice aforethought, unlawfully kill and murder Dorothy Martin, a pregnant woman, by committing an abortion upon her person by "introducing into her female organs a substance which was to the grand jurors finding the indictment unknown and by inserting and packing said substance into the female organs of the said Dorothy Martin, and by using and employing an instrument and chemical and, substance to the grand jurors unknown," thereby causing her death, they would be authorized to find the defendant guilty of murder. The complaint is that the court erred in using the

word "chemical," because there was no evidence that any chemical was used on her person; and further, that it was error for the court to direct the jury to "first consider count one in their deliberations," whereas it was the prerogative of the jury to consider count two of the indictment first if they so desired.

The indictment in this case charged that the death of Dorothy Martin resulted from an abortion committed upon her person by the defendant, and that such abortion was committed by introducing into her female organs "an instrument and chemical and substance to the grand jurors unknown," and that by reason of said act, injuries and wounds were inflicted upon her person from which she died. There was evidence before the jury that, at the time the deceased went to the home of the defendant, she was in normal good health, and there was no evidence before the jury that she had suffered any injury of any kind to her female organs prior to the time she went to the defendant's home. No one was present other than the defendant who could testify as to the kind of instrument or substance that was used on the deceased. The two experts, a physician and a toxicologist, testified that on the autopsy they found a traumatic injury to the cervix or canal between the vagina and the womb, and a discoloration of the canal, and that two clots of blood had been caused from a hemorrhage prior to her death, and that the traumatic injuries they observed could have been caused by the insertion of gauze into the cervix. The expert toxicologist testified that in his opinion, in order to have caused the injuries he observed, "some object had to pass through that cervix which produced a scratching or a moving of the little tender sells that line or cover that canal. Any instrument passed through there will remove some of those cells, just tear them off, and wherever there is a tear you will have this hemorrhage as a result of it." The physician testified that in his opinion the traumatic injury to the cervix was caused by overstretching and rubbing it with something.

Code § 26-1102 makes it a misdemeanor for any one to administer to any pregnant woman "any medicine, drug, or substance, or anything whatever, or [to] *employ any instrument or means whatever*, with intent thereby to produce the miscarriage or abortion of any such woman, unless the same shall be neces-

sary to preserve the life of such woman, or shall be advised by two physicians to be necessary for that purpose." (Italics ours.) The unlawful act charged in the indictment was by virtue of this Code section. Under the nature of the charge in this case and the evidence, direct and circumstantial, we do not see that any harmful error was done to the defendant by the judge's use in his charge of the word "chemical." See *Jones* v. *State,* 65 *Ga.* 621; *Robinson* v. *Murray,* 198 *Ga.* 690 (4) (supra).

Nor do we think that any harmful error was committed by the court informing the jury that in their deliberations on the case they first consider count one of the indictment. Since both counts involved the same offense, and the jury were informed that, if they found the defendant guilty on one count, they could not find him guilty under the other count, and since the major offense was involved in count one, and the jury were instructed that, if they found the defendant not guilty under both counts they should acquit him, we do not see how he could have been prejudiced by the court merely instructing them that they consider count one of the indictment first. We find no error in this regard.

■ Ground 12 complains that the court erred in failing to charge the jury the provisions of Code §§ 26-1101 and 26-1403. It is contended that, under the evidence, a verdict of guilty of assault with intent to murder would have been authorized, and that, under the provisions of § 26-1101, it was the policy of the law that the defendant should not be convicted of murder in any event, if he caused the death of a female pregnant with child as the result of administering to her any substance or employing any instrument or other means with intent thereby to destroy the child, but that such person should be convicted of the lesser offense of assault with intent to murder; and the defendant therefore contends that the jury should have been given the right and option of returning a conviction which would have carried a punishment of not less than two nor more than ten years.

Code § 26-1101 applies only where death results to the child or mother as result of an abortion performed upon "any woman *pregnant with child.*" Under the decisions of this court, the expression "pregnant with child," as used in this Code section, means "an unborn child so far developed as to be ordinarily

called 'quick,' and which is still alive when the alleged unlawful means are employed to produce the miscarriage or abortion." *Taylor* v. *State*, 105 *Ga.* 846 (1) (33 S. E. 190). This Code section, therefore, has no application where the prosecution is for killing a human being as the result of an unlawful abortion where the foetus had not "quickened"; and by the use of the words "pregnant woman" in the indictment, it means to be alleged that the foetus had not quickened. *Summerlin* v. *State*, 150 *Ga.* 173 (103 S. E. 461). Count one of the indictment in this case charges that Dorothy Martin was "a pregnant woman," and all the testimony in the case was to the effect that at the time of her death she had been pregnant from three to four months. There is no testimony that at the time of her death the unborn child had so developed in her womb as to move or stir, or to be "quick." There seems to be universal agreement among medical authorities that quickening occurs during the fourth month of pregnancy. In *Hunter* v. *State*, 29 *Ga. App.* 366 (115 S. E. 277), it was held that proof that the foetus was four months old was not sufficient to show that the child was quick at the time of the alleged abortion; and that, the indictment being drawn under the provisions of what is now known as Code § 26-1101, the evidence was insufficient to authorize a conviction under that section, where it was alleged that the woman was pregnant with child. Under the indictment in this case and the evidence in regard to the age of the foetus, the provisions of Code § 26-1101 were not applicable, and the court did not err in failing to give in charge this section and the provisions of § 26-1403.

■ Ground 13 complains of a portion of the charge dealing with the instances in which an involuntary killing may be murder. In the excerpt complained of, the court charged fully the provisions of Code § 26-1009 as to involuntary manslaughter in the commission of an unlawful act, and the provisions of this section as to the circumstances under which an involuntary killing might constitute murder. In the charge excepted to, the court distinctly told the jury that the mere fact that the act causing the death of the deceased was unlawful would not alone authorize a verdict of guilty of murder, and clearly instructed them that, for an unlawful act to increase the crime from involuntary manslaughter to murder, it must appear that it was an act which

naturally tended to destroy human life. Prior to giving the charge complained of, the court fully defined the law in regard to murder, and express and implied malice, and informed them that they were not concerned with express malice in the case, but only whether there was implied malice. The jury were given the definition of implied malice, and were informed that the defendant could not be convicted of murder unless they found that the involuntary killing was the result of wilful and intentional conduct of the defendant such as showed a wanton and reckless state of mind, which, if shown, would be the equivalent of a specific intent to kill, and which conduct was the proximate cause of the killing; and in a later portion of the charge, after giving the excerpt complained of, the jury were instructed that they could not find the defendant guilty of murder unless they believed beyond a reasonable doubt that the killing by the defendant was done with malice aforethought. We are of the opinion that the excerpt complained of, taken in connection with the entire charge, does not show any error.

■ Ground 14 complains that the court erred in refusing to give in charge the following written request: "If a defendant is being tried for murder as a result of an alleged abortion or attempted abortion, he cannot be convicted on the uncorroborated testimony of one who is an accomplice to the alleged abortion, but there would have to be proof of some independent fact which itself leads to the inference that the accused was guilty of the acts charged."

The court charged the law applicable to the testimony of an accomplice, and that, if the jury under the instructions given found that the witness was an accomplice, such testimony within itself would not be sufficient to sustain a conviction, unless such testimony be corroborated by other competent evidence, and that such corroboration must be of some independent fact or circumstance which, taken by itself, led to the inference that the crime had been committed and that the defendant was implicated in its perpetration. It was for the jury to determine whether the witness was an accomplice, and the sufficiency of the corroboration was likewise a question for the jury. *Hargrove v. State,* 125 *Ga.* 270 (1) (54 S. E. 164); *Williams v. State,* 159 *Ga.* 728 (126 S. E. 844). The complaint here seems to be

that the court should have informed the jury that, where a defendant is being tried *for murder*, he could not be convicted on the uncorroborated testimony of one who was an accomplice to the alleged abortion. It was not error to refuse the requested instruction.

■ We come now to the general grounds of the motion for a new trial. It is insisted: (a) that the evidence was not sufficient to show malice, either express or implied, and therefore that an essential ingredient of murder was missing; and (b) that the evidence was insufficient to show that the deceased died as a result of an abortion.

In this case the State did not rely on proof of express malice, and the court distinctly informed the jury that the law in regard to express malice was not involved, and that they could only convict the defendant of murder if they believed beyond a reasonable doubt that the involuntary killing resulted by reason of implied malice. As pointed out in *Stovall* v. *State*, 106 *Ga.* 443 (32 S. E. 586), if one intends to inflict only a slight personal injury and inflicts it without excuse, such involves malice, and the purpose of the law is to hold the slayer responsible for the consequences of his act—not the consequences which might have ensued, but those which did ensue. In *Myrick* v. *State*, 199 *Ga.* 244 (1) (34 S. E. 2d, 36), it was held: "A presumption of malice may arise from a reckless disregard for human life. A wanton and reckless state of mind is sometimes the equivalent of a specific intent to kill; and such state of mind may be treated by the jury as amounting to such intention when the wilful and intentional performance of an act is productive of violence resulting in the destruction of human life." Under the provisions of Code § 26-1009, where the killing occurs in the commission of an unlawful act which in its consequences naturally tends to destroy human life, it will be deemed and adjudged to be murder. So, it has been held that, where one kills another by reason of operating an automobile on the highways of this State, though an automobile is not *per se* a deadly weapon, if death results from a reckless and unlawful use of an automobile, and the State relies on implied malice in a prosecution for murder in such instance, malice will be implied where all the facts and circumstances show an abandoned and malignant heart, and not otherwise. *Jones* v.

*State,* 185 *Ga.* 68 (194 S. E. 216). This court, in *Gallery* v. *State,* 92 *Ga.* 463 (2) (17 S. E. 863), said: "There are wanton or reckless states of mind which are sometimes the equivalent of a specific intention to kill, and which may and should be treated by the jury as amounting to such intention when productive of violence likely to result in the destruction of life, though not so resulting in the given instance." In *Pool* v. *State,* 87 *Ga.* 526,. 530 (13 S. E. 556), it was said: "The law infers guilty intention from reckless conduct; and where the recklessness is of such character as to justify this inference, it is the same as if defendant had deliberately intended the act committed." In *McPherson* v.. *State,* 22 *Ga.* 478, 487, it was said: "A man *committing* an act,. must be acting voluntarily, and a man voluntarily doing an unlawful act, can not be said to be free from all evil intent." In *Wilbanks* v. *State,* 41 *Ga. App.* 268 (152 S. E. 619), where two defendants were indicted for murder growing out of the death of a pregnant woman and were found guilty of involuntary manslaughter, the court quoted with approval from State *v.* Alcorn,. 7 Idaho 599, the following: "The crime for which appellant has been convicted is one of the worst known to the law. An unnatural abortion brought about by means of drugs or instruments, violates decency, the best interests of society, the divine law, the law of nature, the criminal statutes of this state, and is. not only destructive of life unborn, but places in jeopardy the life of a human being—the pregnant woman. . . This crime is one of grave consequences to society. The law prohibits it and prescribes severe penalties. The law ought to be strictly enforced." P. 274.

At common law, if one performed an unlawful abortion from which death resulted to the woman, the defendant was subject to indictment and trial for murder. 4 Black. Com. 201; 1 Wharton's Criminal Law (12 ed). p. 677, § 441; 1 Warren on Homicide (Perm. ed.) 330, § 74; People *v.* Sessions, 58 Mich. 594 (26 N. W. 291), where the cause of death was shock resulting from an abortion. Our law makes it a misdemeanor to administer to a pregnant woman any medicine, drug, substance, or anything whatever, or to employ any instrument or means whatever, with intent to produce a miscarriage or abortion of any such pregnant woman, unless the same shall be necessary to preserve the life of such woman. Code, § 26-1102.

We have made a careful study of the evidence upon which the jury convicted the defendant of murder, and are of the opinion that the evidence, direct and circumstantial, was sufficient to authorize the jury to find that, from the proven facts and circumstances from which the killing of the deceased resulted, death occurred by reason of implied malice on the part of the defendant, and that his acts were the sole and proximate cause of her death. We will not extensively review the evidence which we feel justifies our conclusion, but will summarily relate the evidence from which we feel that the jury were authorized to draw their conclusion.

One Virgil Echols with Dorothy Martin, a pregnant woman, went to the defendant, a contractor, not skilled in medicine or medical practice, for the purpose of getting the defendant to perform an abortion, and he agreed for a money consideration to induce a miscarriage. A few days after the agreement was made at the home of the defendant, the deceased returned with Echols to the defendant's home, and the defendant carried the woman into an adjoining bedroom and closed the door and left Echols alone in the living room of the house. In about 15 or 20 minutes Echols heard something like a slump in the bedroom, and the defendant "hollered" for Echols, and when Echols went into the room the defendant was holding the deceased around her waist. After Echols got in the room, the woman appeared to be unconscious, and made one gurgling sound. At that time her panties were lying down by the bed. The defendant and Echols put the panties back on her, and while seeking to revive her, Echols asked the defendant what had happened, and he said he had not done a thing "but put gauze in her, he packed her with gauze. He said he packed her with gauze or had put gauze in her womb." The police and an ambulance were summoned by the defendant, and while awaiting their arrival the defendant told Echols to tell the police the woman fainted and they had laid her on the bed, and that Echols should tell them that "tale," because if the police found out what had happened, he, Echols, would be involved in it as much as the defendant. The defendant stated that he would tell the police on their arrival that he and Echols were sitting in the living room and the woman felt faint, and while they started to get a glass of water she

fainted. When the police arrived the woman was dead. The following day an autopsy was performed on the body of the woman by a physician and a toxicologist. They removed the female generative organs, and found that her cervix, which is a small entrance canal from the vagina into the womb, had been dilated, and also found an abrasion about the size of a quarter in the cervix or entrance into the womb, which had been dilated, and evidence of two wounds, one in the cervix and one in the womb. They testified: that dilating the cervix was such an operation as would result in an abortion, and that to insert an instrument in the cervix so as to produce the injury which they found would be very painful, and in their opinion this injury produced such shock that the woman died within a few minutes after infliction of the injury; that gauze could not be inserted through the cervix into the womb without the use of an instrument and the exertion of considerable force; and that no gauze was found in the woman's female organs. The toxicologist stated that, when he reached the defendant's home, before the deceased was removed therefrom, he found that a slip had been rolled up about to her waist line, and subsequently human blood was found on the slip but none on her panties. It appeared from the foetus taken from the dead woman that she had been pregnant from three to four months. According to the testimony of these experts, the autopsy showed that the heart, lungs, and kidneys of the deceased were in a sound and healthy condition, and that in their opinion the death of the woman was caused solely and proximately by the traumatic injuries to her female organs, which produced shock and caused her death within five minutes after the injury. At the time she went to the defendant's home she was in good health, and had not suffered any previous fainting spells. Three days after the death of the woman, some medical supplies and broken packages of gauze bandage were found in the home of the defendant. Under the opinion evidence of the physician and toxicologist, the packing of gauze into the cervix of a pregnant woman by one who had no medical training and was not equipped to relieve shock—causing traumatic injuries to the cervix and womb—was such an act as would naturally tend to destroy human life. They further testified that in their opinion, but for the injuries inflicted upon the deceased, she would not have died.

Though we have found no reported decision by this court which involved a conviction of murder growing out of the death of a pregnant woman by reason of an unlawful abortion, convictions of murder in the first and second degrees in other States under evidence similar in character to that in this case have been sustained. People *v.* Hobbs, 297 Ill. 399 (supra); People *v.* Hagenow, 236 Ill. 514 (86 N. E. 370); People *v.* Zwienczak, 338 Ill. 237 (170 N. E. 303); People *v.* Balkwell, 143 Cal. 259 (76 Pac. 1017); Willis *v.* People, 73 Colo. 369 (215 Pac. 854); People *v.* De Vaughn, 2 Cal. App. 2d, 447 (38 Pac. 2d, 192).

*Judgment affirmed.   All the Justices concur, except Wyatt and Head, JJ., who dissent.   Duckworth C. J., concurs in the judgment only.*